THE CANNON COAL COMPANY, APPELLANT, v. EDWIN
R. TAGGART, APPELLEE.

1. AGENCY—WHEN A CONTRACT TO BUY AND SELL CONSTITUTES.—A
   contract obligating one of the parties to push the sale of the other's
   coal for one year, and to pay for all he may order at an agreed price,
   but not requiring him to take any definite amount, is not a contract
   of purchase and sale, carrying with it an implied warranty of quali-
   ty, but an agency ; and, although the principal is bound to furnish
   merchantable coal, a single failure to do so will not warrant a res-
   cission of the contract, but for this purpose it must appear that
   the coal was generally unsalable.
2. LIABILITY OF AGENT FOR BREACH OF AGREEMENT.—When an
   agent has entered on his employment, under a contract with his
   principal, he may not renounce it without reasonable cause. So
   one who has, by an agreement for a definite time with the coal com-
   pany, assumed to dispose of, as far as he may be able, all coal pro-
   duced by it, he is liable to an action for damages for a breach of the
   agreement without legal excuse.
3. MEASURE OF DAMAGES FOR AGENT'S BREACH OF AGREEMENT TO
   SELL.—Where the agent of a coal company abandons the sale of the
   latter's coal and the company procures another agent at some cost,
   and, so far as may be, themselves endeavor to sell the coal at an
   added expense, this is the principal damage which they are entitled
   to recover in an action for such breach; and although they may be in-
   jured in the matter of the price at which, after the renunciation of
   the agent's engagement, they are compelled to dispose of their pro-
   duct, such difference does not furnish the true basis of recovery.

*Appeal from District Court of Arapahoe County.*

IN 1889, Taggart brought suit against the coal company
to recover certain moneys which he claimed to have loaned
the concern, and which were due at the time of the bring-
ing of the suit. It was substantially agreed that the amount
of his claim (if he was entitled to recover at all) was $272.80,
The defense made by the company consisted of denials and
a counter-claim. The counter-claim which the company set
up was based upon the transactions had between the parties
under the following contract: " This agreement, made this
first day of September, A. D. 1888, by and between the Can-
non Coal Company, party of the first part, and E. R. Tag-

gart, party of the second part, both of Denver, Arapahoe county, Colorado: For and in consideration of the covenants hereinafter to be mentioned, the party of the first part agrees to furnish to the said party of the second part coal from their mines, situated in Boulder county, Calorado, at the following prices, said prices to be on cars at mine : For lump coal, 2000 lbs., the price shall be $1.85; for screen nut coal, 2000 lbs., 90c.; for mine nut coal, 35c. per ton. Said coal to be weighed on railroad track scales, at the mine of the first party, owned and to be operated by the party of the first part, and shall be the weight by which all coal shall be sold.

" The party of the first part hereby agrees to place the lump coal on board cars in a good marketable manner. That the coal shall run over screens $1\frac{1}{4}$ inches apart, or as much wider as the Association of Miners in force in our district will allow. The screened nut coal will be the coal passing from the lump coal through an additional screen, set as the law of the association decides, and the mine nut coal will be the coal that passes through the screen from the lump coal, containing the slack from the mine.

" The party of the first part hereby agrees to furnish all the coal that they are liable to furnish to the party of the second part, or their orders, at the above price. The party of the first part do not bind themselves, nor lay themselves liable to damages or redress, for an inability to furnish the said party of the second part coal beyond their ability to do so.

" The said party of the second part hereby agrees with the said party of the first part to receive at all times any coal shipped to them in consequence of orders that they may make to the above first party, either by letter, telephone message to the office of the said party of the first part, situated in Denver, Colorado, or to the office at the mine, situated in Boulder county.

" In consideration of the above price, the said party of the second part hereby agrees to push the sale of said coal with energy. And the said party of the second part agrees to pay for all coal procured from the party of the first part, on

or before the 10th day of each month, at the price per ton named above. And it is further agreed by the party of the first part that the party of the second part shall have the preference on all shipments of coal from the mine to Denver.

" And it is moreover agreed that in no case will the party of the first part sell coal in Denver to retail dealers at less rates than those established and now in force, unless a break is made by the Colorado Fuel Co., the Colorado and Texas Coal Co., or the Marshall Consolidated Coal Co. The true intent and meaning of this clause is to the end that perfect unity of action may be preserved and demoralization prevented.

" The party of the second part shall be placed on an equal footing, in regard to the sale of coal in Denver, as the chief office here; so that buyers may elect to select either the party of the first part or the second part to purchase from.

" In case of an advance in mining, or a general advance of the trade, the party of the second part agrees to an equitable advance, and the same to apply in case of a decline.

" The agreement shall continue one year from present date, and longer if mutually agreed upon. In witness whereof we have hereunto set our hands and seals this first day of September A. D. 1888."

Evidence was introduced tending to show that the parties had proceeded under the contract for some months, and that considerable coal had been delivered under it to Taggart, who had either paid for it at the time of its delivery or by his previous advances, and that these transactions left the balance which he claimed. He ceased to take coal under the agreement some time in April of the ensuing year, and evidence was introduced by the company tending to show that they had been put to some expense in procuring other persons to handle their coal, and that there was some loss of trade by reason of the alleged breach. These resulting damages were the basis of the claim which they made. Upon the conclusion of the trial the court instructed the jury upon two propositions. The first, in substance, told the jury that this was a contract for the sale of goods to be produced by

the vendor, and that there was an implied warranty under the law that what should be delivered should be of a merchantable character. He further instructed them that the measure of damages was the loss of the sale of coal, and the loss of the profit which might result from the sales as made, and the jury might take into consideration the prices at which the coal was sold, whether that named in the contract or any lower figure; substantially telling them that this was the sole measure of defendant's recovery under that cause of action as it had pleaded it. Exceptions were taken to the instructions as given, and errors are predicated upon these exceptions.

Mr. H. B. JOHNSON, for appellant.

Mr. F. A. WILLIAMS, for appellee.

BISSELL, J. The right construction of the contract into which the parties entered will determine this appeal. The interpretations put on it by the trial court led to the giving of the instructions which are complained of. If it was a contract for the sale of personal property not in existence at the time of the bargain, and to be produced by the vendor, it would be necessary to decide whether such a sale carried with it an implied warranty that the goods sold were merchantable. The *nisi prius* court so regarded it, and told the jury that the coal must be of a merchantable quality, and, should they find otherwise, it would justify the defendant in refusing to receive the coal tendered. The matter was not put on the basis of a right to terminate the agency, which was created by the agreement, because of a breach of its terms by the principal, but on the theory of a sale, and a rejection of the goods. This was wholly unwarranted by the legal obligations which the parties were under, and by the case as it was made, and it must have misled the jury.

In no sense which permits the application of that rule can it be said that the contract was one of purchase and sale. There was no sale of a specific quantity of coal, or of the

output of the mine. Taggart was not bound to buy a ton of coal. He might buy a thousand tons a month, all that the mine produced, or none. What he ordered he was bound to receive, and pay for at the price agreed on. In some respects, chiefly relating to the obligation to pay for what he might order, it was like a contract of sale. In the absence of an obligation to order, take, or purchase any amount, definite or indefinite, it lacked an element which always accompanies a contract of sale. The company was obligated to fill any orders which Taggart might send, to the extent of their output, at so much per ton. The correlative promise by Taggart was in reality the assumption of an agency to dispose, as far as he might be able, of what the company might produce. The pith of the agreement, which was of advantage to the coal company, was the contract to work up a trade for their coal, which Taggart assumed. His compensation was in the price at which he was permitted to buy. Any breach of this agreement by Taggart without a legal excuse would necessarily subject him to a liability enforceable by action. The time specified in the contract for the duration of the agency is not essential to the liability. As a general thing, an agent may at any time renounce his employment, but he must do it in good faith, and in such fashion as not to injure his principal. When once he has entered on his employment, he may not renounce it without reasonable cause; and, failing in this, he will render himself liable for the consequences. Story, Ag. § 478 ; *White v. Smith*, 6 Lans. 5 ; *U. S. v. Jarvis*, Daveis 274 ; *Elsee v. Gatward*, 5 Term R. 143.

When the agreement is that he shall continue for a definite period, and he commences to do what he has promised, *a fortiori* will he be liable to respond in damages if he break his engagement without legal excuse.

When the company averred, and offered evidence tending to show, that Taggart had broken his contract in this particular, they were entitled to go to the jury on the question of damages without the burden of a stated liability, that the

sale was one which carried with it an implied warranty of quality. The plaintiff could doubtless insist that he had a right to withdraw from the engagement because of the failure of the company to furnish coal which was salable in the market; but he must assume the burden of showing that the coal was in general unsalable in the market. He might reject any particular lot sent on his order if it was not fairly within the designation of " merchantable coal," but a single failure would not warrant a rescission of the contract. He must show that it was not within the reasonable limits of the trade in coal, and that from its frequency it would be unjust to require him to continue his agency. This limitation should have been expressed to the jury in connection with the statement of the obligation to deliver merchantable coal.

A like difficulty arises from the rule of damages laid down. The difference between the price at which coal was to be sold to Taggart and that which the company realized after he renounced his engagement does not furnish the true basis of recovery. Whatever may hereafter be said of it as an element in the problem, it is not the principal term. That is to be found in the services agreed to be rendered, plus the cost of replacing them on the abandonment. The company introduced evidence which tended to show that, on Taggart's refusal to further continue to " push the sale" of their coal, they procured another agent to fill his place at some cost, and, so far as might be, themselves endeavored to sell the coal, at an added expense. This was the principal damage which they were entitled to recover, and it was error for the court to state the law otherwise. There might possibly have been an injury sustained in the matter of the price at which the company were, after the change, compelled to dispose of their product; but the difference in price is not *per se* a measure by which to determine the injury. In a special and limited sense it might be. Should the proof demonstrate that the company was only able to procure an agent to handle their production by conceding less advantageous terms to

them in the matter of the price which the agent would pay, whereby their profits were diminished, such proof would entitle them to go to the jury on the question of a loss of profits as shown in the matter of price.   On the other hand, if the new bargain was a more advantageous one to the company, it would, on a similar principle, reduce their recovery. The question of sales to purchasers generally, and the matter of profits resulting therefrom, can in no manner be said to properly enter into the solution of the question of damage.

The jury was not properly instructed upon either of these matters, and the error of the court in these particulars compels a reversal of the judgment.

*Reversed.*