27 P. 238 
1 Colo.App. 60
 CANNON COAL CO. v. TAGGART. 
Court of Appeals of Colorado
July 7, 1891

 
 Appeal
 from district court, Arapahoe county; O.B. LIDDELL, Judge.
 [27 P. 239] 
 
 In
 1889, Taggart brought suit against the coal company to
 recover certain moneys which he claimed to have loaned the
 concern, and which were due at the time of the bringing of
 the suit. It was substantially agreed that the amount of his
 claim (if he was entitled to recover at all) was $272.80. The
 defense made by the company consisted of denials and a
 counter-claim. The counter-claim which the company set up was
 based upon the transactions had between the parties under the
 following contract: "This agreement, made this first day
 of September, A.D.1888, by and between the Cannon Coal
 Company, party of the first part, and E.R. Taggart, [1
 Colo.App. 61] party of the second part, both of Denver,
 Arapahoe county, Colorado: For and in consideration of the
 covenants hereinafter to be mentioned, the party of the first
 part agrees to furnish to the said party of the second part
 coal from their mines, situated in Boulder county, Colorado,
 at the following prices, said prices to be on cars at mine:
 For lump coal, 2,000 lbs., the price shall be $1.85; for
 screen nut coal, 2,000 lbs., 90c.; for mine nut coal, 35c.
 per ton. Said coal to be weighed on railroad track scales, at
 the mine of the first party, owned and to be operated by the
 party of the first part, and shall be the weight by which all
 coal shall be sold. The party of the first part hereby agrees
 to place the lump coal on board cars in a good marketable
 manner. That the coal shall run over screens 1 1/4 apart, or
 as much wider as the Association of Miners in force in our
 district will allow. The screened nut coal will be the coal
 passing from the lump coal through an additional screen, set
 as the law of the association decides, and the mine nut coal
 will be the coal that passes through the screen from the lump
 coal, containing the slack from the mine. The party of the
 first part hereby agrees to furnish all the coal that they
 are liable to do to the party of the second part, or their
 orders, at the above price. The party of the first part do
 not bind themselves, nor lay themselves liable to damages or
 redress, for an inability to furnish the said party of the
 second part coal beyond their ability to do so. The said
 party of the second part hereby agrees with the said party of
 the first part to receive at all times any coal shipped to
 them in consequence of orders that they may make to the above
 first party, either by letter, telephone message to the
 office of the said party of the first part, situated in
 Denver, Colorado, or to the office at the mine, situated in
 Boulder county. In consideration of the above price, the said
 party of the second part hereby agrees to push the sale of
 said coal with energy. And the said party of the second part
 agrees to pay for all coal procured from the party of the
 first part, on [1 Colo.App. 62] or before the 10th day of
 each month, at the price per ton named above. And it is
 further agreed by the party of the first part that the party
 of the second part shall have the preference on all shipments
 of coal from the mine to Denver. And it is moreover agreed
 that in no case will the party of the first part sell coal in
 Denver to retail dealers at less rates than those established
 and now in force, unless a break is made by the Colorado Fuel
 Co., the Colorado and Texas Coal Co., or the Marshall
 Consolidated Coal Co. The true intent and meaning of this
 clause is that to the end that perfect unity of action may be
 preserved and demoralization prevented. The party of the
 second part shall be placed on an equal footing, in regard to
 the sale of coal in Denver, as the chief office here; so that
 buyers may elect to select either the party of the first part
 or the second part to purchase from. In case of an advance in
 mining, or a general advance of the trade, the party of the
 second part agrees to an equitable advance, and the same to
 apply in case of a decline. The agreement shall continue one
 year from present date, and longer if mutually agreed upon.
 In witness whereof we have hereunto set our hands and seals
 this first day of September, A.D.1888." Evidence was
 introduced tending to show that the parties had proceeded
 under the contract for some months, and that considerable
 coal had been delivered under it to Taggart, who had either
 paid for it at the time of its delivery or by his previous
 advances, and that these transactions left the balance which
 he claimed. He ceased to take coal under the agreement some
 time in April of the ensuing year, and evidence was
 introduced by the company tending to show that they had been
 put to some expense in procuring other persons to handle
 their coal, and that there was some loss of trade by reason
 of the alleged breach. These resulting damages were the basis
 of the claim which they made. Upon the conclusion of the
 trial the court instructed the jury upon two propositions.
 The first, in substance, told the jury that this was a
 contract for the sale of goods to be produced by [1 Colo.App.
 63] the vendor, and that there was an implied warranty under
 the law that what should be delivered should be of a
 merchantable character. He further instructed them that the
 measure of damages was the loss of the sale of coal, and the
 loss of the profit which might result from the sales as made,
 and the jury might take into consideration the prices at
 which the coal was sold, whether that named in the contract
 or any lower figure; substantially telling them that this was
 the sole measure of defendant's recovery under that cause
 of action as it had pleaded it. Exceptions were taken to the
 instructions as given, and errors are predicated upon these
 exceptions.
 
 
 H.B.
 Johnson, for appellant.
 
 
 F.A.
 Williams, for appellee.
 
 
 BISSELL,
 J., (after stating the facts as above.)
 
 
 The
 right construction of the contract into which the parties
 entered will determine this appeal. The interpretations put
 on it by the trial court led to the giving of the
 instructions which are complained of. If it was a contract
 for the sale of personal property not in existence at the
 time of the bargain, and to be
 [27 P. 240.] 
 produced by the vendor, it would be necessary to decide
 whether such a sale carried with it an implied warranty that
 the goods sold were merchantable. The nisi prius court so
 regarded it, and told the jury that the coal must be of a
 merchantable quality, and, should they find otherwise, it
 would justify the defendant in refusing to receive the coal
 tendered. The matter was not put on the basis of a right to
 terminate the agency, which was created by the agreement,
 because of a breach of its terms by the principal, but on the
 theory of a sale, and a rejection of the goods. This was
 wholly unwarranted by the legal obligations which the parties
 were under, and by the case as it was made, and it must have
 misled the jury. In no sense which permits the application of
 that rule can it be said that the contract was one of
 purchase and sale. There was no sale of a specific quantity
 of coal, or of the [1 Colo.App. 64] output of the mine.
 Taggart was not bound to buy a ton of coal. He might buy a
 thousand tons a month, all that the mine produced, or none.
 What he ordered he was bound to receive, and pay for at the
 price agreed on. In some respects, chiefly relating to the
 obligation to pay for what he might order, it was like a
 contract of sale. In the absence of an obligation to order,
 take, or purchase any amount, definite or indefinite, it
 lacked an element which always accompanies a contract of
 sale. The company was obliged to fill any orders which
 Taggart might send, to the extent of their output, at so much
 per ton. The correlative promise by Taggart was in reality
 the assumption of an agency to dispose, as far as he might be
 able, of what the company might produce. The pith of the
 agreement, which was of advantage to the coal company, was
 the contract to work up a trade for their coal, which Taggart
 assumed. His compensation was in the price at which he was
 permitted to buy. Any breach of this agreement by Taggart
 without a legal excuse would necessarily subject him to a
 liability enforceable by action. The time specified in the
 contract for the duration of the agency is not essential to
 the liability. As a general thing, an agent may at any time
 renounce his employment, but he must do it in good faith, and
 in such fashion as not to injure his principal. When once he
 has entered on his employment, he may not renounce it without
 reasonable cause; and, failing in this, he will render
 himself liable for the consequences. Story, Ag. Â§ 478; White
 v. Smith, 6 Lans. 5; U.S. v. Jarvis, Daveis, 274; Elsee v.
 Gatward, 5 Term R. 143. When the agreement is that he shall
 continue for a definite period, and he commences to do what
 he has promised, a fortiori will he be liable to respond in
 damages if he break his engagement without legal excuse. When
 the company averred, and offered evidence tending to show,
 that Taggart had broken his contract in this particular, they
 were entitled to go to the jury on the question of damages
 without the burden of a stated liability, that the [1
 Colo.App. 65] sale was one which carried with it an implied
 warranty of quality. The plaintiff could doubtless insist
 that he had a right to withdraw from the engagement because
 of the failure of the company to furnish coal which was
 salable in the market; but he must assume the burden of
 showing that the coal was in general unsalable in the market.
 He might reject any particular lot sent on his order if it
 was not fairly within the designation of "merchantable
 coal," but a single failure would not warrant a
 rescission of the contract. He must show that it was not
 within the reasonable limits of the trade in coal, and that
 from its frequency it would be unjust to require him to
 continue his agency. This limitation should have been
 expressed to the jury in connection with the statement of the
 obligation to deliver merchantable coal.
 
 
 A like
 difficulty arises from the rule of damages laid down. The
 difference between the price at which coal was to be sold to
 Taggart and that which the company realized after he
 renounced his engagement does not furnish the true basis of
 recovery. Whatever may hereafter be said of it as an element
 in the problem, it is not the principal term. That is to be
 found in the services agreed to be rendered, plus the cost of
 replacing them on the abandonment. The company introduced
 evidence which tended to show that, on Taggart's refusal
 to further continue to "push the sale" of their
 coal, they procured another agent to fill his place at some
 cost, and, so far as might be, themselves endeavored to sell
 the coal, at an added expense. This was the principal damage
 which they were entitled to recover, and it was error for the
 court to state the law otherwise. There might possibly have
 been an injury sustained in the matter of the price at which
 the company were, after the change, compelled to dispose of
 their product; but the difference in price is not per se a
 measure by which to determine the injury. In a special and
 limited sense it might be. Should the proof demonstrate that
 the company was only able to procure an agent to handle their
 production by conceding less advantageous terms to [1
 Colo.App. 66] them in the matter of the price which the agent
 would pay, whereby their profits were diminished, such proof
 would entitle them to go to the jury on the question of a
 loss of profits as shown in the matter of price. On the other
 hand, if the new bargain was a more advantageous one to the
 company, it would, on a similar principle, reduce their
 recovery. The question of sales to purchasers generally, and
 the matter of profits resulting therefrom, can in no manner
 be said to properly enter into the solution of the question
 of damage. The jury was not properly instructed upon either
 of these matters, and the error of the court in these
 particulars compels a reversal of the judgment. Reversed.