[Civ. No. 8995. First Appellate District, Division Two.—June 16, 1933.]

N. H. SPITZER et al., Respondents, v. PATHE EXCHANGE, INC. (a Corporation), Appellant.

Bauer, MacDonald, Schultheis & Pettit, Fred E. Pettit, Jr., Condert Brothers and Lewis A. R. McInnerarity for Appellant.

J. F. T. O'Conner, Delvy T. Walton, C. J. Mulvane and Lord, Day & Lord for Respondents.

STURTEVANT, J.—The plaintiffs commenced an action against the defendant to obtain relief for the nonperformance of a contract. The defendant answered and the trial was had before the trial court sitting without a jury. The court made findings in favor of the plaintiffs and from the judgment based thereon the defendant has appealed.

In the early part of the year 1925, N. H. Spitzer, one of the plaintiffs, entered into a contract with the defendant under the terms of which the plaintiffs agreed to make several motion pictures. The defendant agreed to pay on the acceptance of each picture a certain sum of money and thereafter to distribute the picture through its sales channels and out of the proceeds to pay certain additional sums to the plaintiff N. H. Spitzer. The main office of the defendant was located in New York. The studio and laboratories of the plaintiff N. H. Spitzer were located in Los Angeles County. Soon after the contract was executed the plaintiff Spitzer came from New York to Los Angeles and entered upon the performance of the contract. The first picture he undertook was one entitled "Heirloons". To create a picture the plaintiff N. H. Spitzer was compelled to employ many prominent actors, numerous persons as assistants, and to make large expenditures. To enable him to meet his expenses it became necessary for him to obtain financial assistance. He applied to the plaintiff

Cinema Finance Corporation, which undertook to make the advances under the terms of a certain assignment which will hereinafter be more specifically discussed. About the middle of August, 1925, the first picture, hereinafter called the first version, had been finished and the plaintiff N. H. Spitzer took it to New York and tendered it to the defendant. In an eastern theater before a committee selected by the defendant the picture was exhibited. Basing its action on the report of its committee the defendant declined to accept the picture. After some oral discussion between the plaintiff N. H. Spitzer and Mr. Elmer Pearson, the manager of the defendant, it was agreed that certain alterations and changes should be made in the picture. Thereupon the films were shipped back to Los Angeles and the plaintiffs undertook to make the changes which Mr. Pearson had asked to be made. The changes consisted of certain deletions and some additions. After the changes had been made the picture, as changed and hereinafter called the second version, was again delivered to the defendant. The second version was then exhibited to a committee selected by the defendant. The report of the committee was adverse. On December 16, 1926, Mr. Pearson telegraphed Mr. Spitzer, ''Our rejection of Heirloons on ground that it is not of quality called for by contract is definite and final.'' After that date and before the date of the trial some other changes were, by consent, made in one copy of the picture and there resulted what will hereinafter be termed the third version. That copy was made to fill an order from abroad. After the telegram just mentioned the films were never returned to the plaintiffs. While the trial was being held, acting on the request of the defendant and with the consent of the plaintiffs, one version of the picture was exhibited at Culver City before an audience including the judge of the trial court, the officers of the court, and the parties and their counsel. As we understand the record, the fact does not clearly appear whether the picture so exhibited was the first, second or third version. No additional pictures were taken and added to the first version. It is therefore apparent that the picture so exhibited was at least a part of if not the first version.

616

■ The defendant contends that there is no evidence whatever in the record supporting the allegations of the complaint that the picture "Heirloons", as referred to in said complaint, was of a quality called for by the contract. One of the covenants contained in the contract was, "Each of said pictures shall be of the highest quality as regards acting, action, directing, photography, and consistency of story." As we understand the defendant it asserts that the evidence did not show that the picture as tendered complied with any one of the calls of the contract which we have just quoted. The plaintiffs reply that the trial court made findings which, among other things, found as follows: "That the picture Heirloons was and is a feature comedy as contemplated by said contract, and was and is of the highest quality as regards acting, action, direction, photography and consistency of story. . . ." Continuing, they quote the telegram sent by Mr. Pearson as supporting the finding. They go further, and they quote the testimony of Mr. Pearson given on the trial, which was to the effect that his objection was based solely on the ground of quality. Furthermore, they quote the evidence of Mr. Pearson to the effect that he had no objection to the picture by reason of the direction, acting or photography. Moreover, they quote the testimony of other witnesses who testified in language highly commendatory of the picture. In another place the plaintiffs stress the fact that the trial court saw the picture exhibited and after seeing the picture exhibited the court made findings in favor of the plaintiffs. Thereupon the plaintiffs contend that at the very least it must be conceded that there was evidence supporting the court's findings and if there was any conflict in the evidence a court of review will not undertake to disturb the finding. We think these replies are abundantly sustained by the record.

■ In this connection the defendant vigorously contends that the plaintiffs should be confined to the tender and offer made in December, 1925. The point is untenable. There is no evidence in the record that the picture as produced was rejected prior to December 16, 1925. Furthermore, there was evidence that the first version fulfilled every call of the contract and that all changes subsequently made were made on the request of the defendant.

▉ In the next place the defendant contends there is no evidence supporting the findings that the conveyance given by the plaintiff Spitzer to the Cinema Finance Corporation, including copyright, was ever consented to by the defendant. It is perfectly clear that in paragraph twenty-five of the contract there are certain provisions against assignment. Furthermore, during the trial much time was devoted to the introduction of evidence showing or tending to show the nature of the assignment made by the plaintiff Spitzer to the Cinema Finance Corporation and the consent, if any, given by the defendant to that transaction. Several of the findings made by the trial court deal with that conveyance and its effect on the rights of the parties. In substance the findings of the trial court were that the conveyance was in its nature temporary and as a mere matter of security for the advances made by the Cinema Finance Corporation, in other words, a lien. The defendant in writing executed a document expressly consenting to a lien. The defendant does not in its brief show that the transaction was not as stated in the findings of the trial court or that it was otherwise than a mere lien and consented to by the defendant. We think that the finding is supported by the evidence.

▉ The next contention of the defendant is that there was no evidence that the defendant ever gave its approval of the compensation paid to the actors other than Wallace McDonald and Stuart Holmes. The contract contained a covenant that ''the leading artists and the principal members of the cast for each of the same and their compensation shall be subject to Pathe's approval''. After Mr. Spitzer commenced his work a formal written contract showing the compensation was executed by each actor. Those formal contracts as so executed were at once sent to the defendant. No objection was made to any one of them except as to two actors. Later those objections were withdrawn and an approval was expressly given. In this same connection there was at least some evidence showing that a written approval was expressly given as to each and every one of the actors. However, the evidence regarding the consents lastly mentioned was unsatisfactory as it is not altogether clear whether the documents were lost or destroyed. Nevertheless, some of them were not

produced at the trial. Although there was a vast amount of correspondence introduced in evidence there was not a particle of evidence to the effect that the defendant did not receive copies of the contracts with the actors nor was there any evidence that it disapproved the compensation or the employment of any actor except as we have mentioned.

During the trial and when the foregoing matters were being discussed the trial court called attention to the telegram dated December 16, 1925, in which the defendant rejected the production tendered by the plaintiffs. Thereupon the court remarked: "I have always assumed that where an offer of performance was refused, and a statement of refusal was made that there was a certain specified ground for that refusal, then the party making that refusal could not be heard, in case of litigation over the transaction, to say that it was refused on some other and different ground." In no place did the trial court decline to receive evidence of other grounds. In no place did the defendant undertake to introduce any evidence limiting the force and effect of the language contained in the telegram. As hereinabove stated, the findings were to the effect that the plaintiffs did and performed those things which the contract called upon them to do and perform. In view of all these circumstances we are not inclined to hold that the point last discussed finds support in the record.

In the next place the defendant asserts that the amount of the damages awarded to the plaintiffs is materially in excess of the amount warranted by the pleadings and the facts in the case. In computing damages the trial court computed the expenditures of the plaintiffs. It found they amounted to $111,695.25. It then found that the plaintiffs, by consent of the defendant, had sold certain foreign rights and had received $9,196.50, which the trial court deducted from the amount of the expenditures and, for the balance, $102,498.75, it gave judgment as for damages.

The defendant's contention requires a statement as to the nature of the contract. That instrument is very long and it will serve no purpose to quote extensively. By its terms the plaintiff N. H. Spitzer for a fixed term employed the defendant as his agent to exploit and distribute the pictures produced by the plaintiff and to finance

the undertaking. The defendant agreed to make certain advances at an agreed rate of interest and the plaintiff agreed that such advances should be repaid. Loss by fire was at the risk of the plaintiff and insurance was at his expense. Title to the negatives at all times was to remain in the plaintiff. The defendant was to have title to certain positives only. Incidentally Pathe agreed to loan moneys. Before the end of the term Pathe, according to the findings, wrongfully abandoned the contract. Under all of the authorities it became liable to the plaintiff in damages. (3 Sedgwick on Damages, sec. 824; 1 Mechem on Agency, sec. 641; 2 C. J. 542; Story on Agency, sec. 478.) The natural damages for the breach by an agent of his contract of agency were the cost and expenses of getting another agent to render the service specified in the contract. (*Cannon Coal Co.* v. *Taggart,* 1 Colo. App. 60 [27 Pac. 238, 240]; *John Hetherington & Sons* v. *William Firth Co.,* 210 Mass. 8 [95 N. E. 961, 966]; *F. E. Atteaux & Co.* v. *Mechling Bros. Mfg. Co.,* 245 Mass. 483 [140 N. E. 271, 278]; 2 C. J. 542.) ▋ In so far as anything is contained in the briefs or has been called to our attention, we do not find that any evidence was introduced proving, or tending to prove, the natural damages. If by reason of any peculiar circumstances it was impossible by reason of the nature of the commodity or the nature of the market for the plaintiffs to have obtained another sales agency, the plaintiffs should have pleaded and proved the facts. The burden was on them. (*F. E. Atteaux & Co.* v. *Mechling Bros. Mfg. Co., supra.*) This they made no attempt to do. ▋ The plaintiffs cite and rely on the doctrine stated in *Hadley* v. *Baxendale,* 156 Eng. Reprint, 145. In doing so it is their claim that when the parties entered into the contract both knew that the cost of the picture would be approximately as found by the trial court, $111,695.25; that if the contract was broken by the defendant the plaintiffs would lose said sum. However, before the plaintiffs may be heard to make this contention it was necessary that they plead and prove the facts and that they bring up a finding thereon. (*Mitchell* v. *Clarke,* 71 Cal. 163, 169 [11 Pac. 882, 60 Am. Rep. 529].) As to what the parties, or either of them, knew or communicated one to the other of the plaintiffs' possible loss, if any, in obtaining finances or

assistance in distribution and exploitation in the event that the defendant should breach its contract, the record is wholly silent. Therefore, this record does not present facts allowing the application of any rule except that applicable to the damages which naturally and necessarily resulted from the act complained of. *Overstreet* v. *Merritt*, 186 Cal. 494 [200 Pac. 11], strongly relied on by the plaintiffs, contains nothing at variance with what we have said.

In this same connection the plaintiffs cite *Cederberg* v. *Robison*, 100 Cal. 93 [34 Pac. 625]. However, we do not understand them as contending that the plaintiffs were entitled to recover their outlay necessarily incurred in producing the picture because the defendant refused to perform. The doctrine of the case cited rests on *United States* v. *Behan*, 110 U. S. 338 [4 Sup. Ct. 81, 28 L. Ed. 168], which is one of the leading cases on that subject. At page 344 of 110 U. S., Mr. Justice Bradley, speaking for the court, said: "The *prima facie* measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely, first, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract." In the instant case there was no evidence of profits. There was no evidence that the picture produced by the plaintiffs was of no value; but as the plaintiffs earnestly contend it was of great value. It is clear, therefore, that their damage, as the record now stands, may not be said to be the amount of their total expenditures less $9,196.50, the amount received from the sale of certain foreign rights.

The defendant claims that its liability should be limited to the amount of damages that would be awarded against one who breaks a contract agreeing to loan money. (*Hadden* v. *Schneblin*, 126 Mo. App. 478 [104 S. W. 887].) While that element enters into this case and would be a proper subject of inquiry, the contract clearly shows that the liability of the defendant would not be limited to that sum.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with what has been said above on the single issue of damages. As to that issue both parties should be allowed to make such amendments to their pleadings as they deem necessary.

Nourse, P. J., concurred.