[No. 34348. Department Two. January 16, 1958.]

L. E. WINKENWERDER *et al., Respondents,* v. J. L. KNOX, *Appellant.*[1]

[Reported in 320 P. (2d) 304.

*Tonkoff, Holst & Hopp,* for appellant.

*Velikanje, Velikanje & Moore and Paul M. Goode,* for respondents.

DONWORTH, J.—This is an action for damages based upon the failure of appellant to complete the performance of certain services in accordance with the terms of a written contract. Appellant cross-complained for the unpaid balance of the compensation agreed to be paid by respondents. The case was tried to the court, sitting without a jury, which rendered judgment in favor of respondents.

In April, 1955, respondents (then a partnership) desired to close out a retail hardware business which they operated in Toppenish. For that purpose, respondents, through L. E. Winkenwerder (who will be hereinafter referred to as if he were the sole respondent) entered into a contract with appellant, providing, in part:

"Witnesseth: That . . . [appellant and respondent] mutually agree to make a special sale of the stock of the . . . [respondent]; sale to commence on or about the 29 day of April 1955.

"The . . . [appellant] agree[s] to take full charge of and manage said sale through . . . [his] special sales manager, using . . . [his] best efforts and endeavors to conduct a Closing Out or Stock Reduction Sale, whichever the . . . [respondent] may desire.

"The . . . [respondent] shall set all prices on merchandise to be sold, regulate and pay the advertising expenses and materials, appoint and pay the sales people and cashier.

"The . . . [appellant] agree[s] to furnish a sales manager for 5 weeks to arrange the stock and conduct the sale. The sales manager is to write all advertising matter that the . . . [respondent] wish[es] to use during said sale, and to make all signs and banners necessary during said sale.

"The . . . [respondent] shall pay the . . . [appellant] for . . . [his] services in conducting the sale the sum of SEVENTEEN HUNDRED FIFTY DOLLARS Payable by check to the order of J. L. KNOX SALES Co. as follows: $350.00 payable each Saturday starting April 30th 1955. Sale to close out entire stock in 30 days *or J. L. Knox will continue sale until stock is sold, free of charge.*" (Italics ours.)

Appellant Knox resided in Long Beach, California, and was engaged in the business of conducting liquidation and stock reduction sales in various places in the United States. His method of doing business was to send one of his employees to actually supervise the conduct of the sale. The breach sued for by respondent was the alleged failure of Knox to perform the italicized provision of the contract quoted above.

On April 22nd or 23rd, Mr. Denchfield, appellant's sales manager, arrived in Toppenish. Under his direction, preparations were made for the sale, which commenced, as scheduled, on April 29th. During the first week, sales were good, but they thereafter commenced to decline.

As provided in the contract, respondent mailed to appellant a check for three hundred fifty dollars each Saturday for three successive weeks, commencing April 30th. How-

ever, no check was sent on May 21st or on May 28th, 1955. Respondent explained that he could see that the merchandise would not be liquidated before May 28th, and that he "couldn't get any satisfaction out of Mr. Denchfield or any word out of Mr. Knox" as to appellant's plans in connection with the disposal of the merchandise remaining after the sale closed.

The sale was terminated at the close of business, May 28th, with the full knowledge and acquiescence of respondent. Mr. Denchfield departed from Toppenish that evening.

Appellant arrived in Toppenish on Monday, May 30th (a holiday), and went to respondent's store, where he saw a sign on the door stating that the sale had ended Saturday, May 28th. He then went to Yakima (where respondents had another hardware store). From May 30th to June 2nd, he tried to contact respondent by telephone at his Yakima store. On Thursday, June 2nd, he succeeded in reaching him, and arranged a meeting for the following day.

From May 31st through June 1st, respondent caused an inventory of the remaining stock to be made, and had those goods transported to his hardware store in Yakima, which is about twenty miles from Toppenish.

At the meeting of June 3rd, appellant demanded the seven-hundred-dollar balance due him, but made no offer to continue the sale. Respondent refused to pay appellant the amount demanded, and thereafter commenced this action.

Respondent set out damages in his bill of particulars, as follows:

"That at the time defendant breached his contract there was stock on hand at a cost price of $15,226.74, but by failing to continue said sale, said inventory decreased in value by 50% thereby the [respondent] suffered loss of $7,613.37. That by the discontinuance of said sale, it became necessary to move said stock and merchandise at a cost of $292.64. . . ."

The trial court found that appellant failed to continue the sale after the entire stock was not sold within the thirty-day period ending May 28, 1955; and that appellant's failure to do so constituted a breach of the contract.

The court awarded damages on the basis set out in respondent's bill of particulars, except that only $190 was awarded as the cost of moving the merchandise from Toppenish to Yakima. Appellant's cross-complaint for seven hundred dollars was dismissed with prejudice.

Appellant moved the court for a judgment notwithstanding its oral decision, or, in the alternative, for a new trial, asserting that an improper measure of damages had been applied. Both motions were denied, but the latter, particularly, upon the ground that no objection had been taken by appellant to the introduction of evidence—written or testimonial—concerning respondent's theory as to the measure and amount of damages.

On appeal, appellant first assigns error to the trial court's finding of fact that appellant breached his contract by failing

". . . to continue the sale until all of the stock was sold when the entire stock was not sold within the thirty (30) day period, ending May 28, 1955; . . ."

Appellant contended that respondent, by keeping the Toppenish store closed after May 28th, and by transporting the remaining stock of goods to Yakima, had made performance impossible. This finding of fact is based upon sharply conflicting evidence, and, since we are unable to say that the evidence preponderates against it, the finding will not be disturbed. *McDonald v. Wockner*, 44 Wn. (2d) 261, 267 P. (2d) 97 (1954), and cases cited therein.

It is next contended that the trial court "erred in its computation of time with reference to when the sale period by Knox should commence." Appellant argues that the last paragraph of the contract, which provides, "Sale to close out entire stock in 30 days or J. L. Knox will continue sale until stock is sold, free of charge," contemplates thirty "selling" days. The contract is not ambiguous in this regard. The sale ran two days in April and through the 28th day of May, 1955, or thirty days. Appellant prepared the contract, and, if the parties had agreed to something other than thirty calendar days, he could have expressed their true intentions with clarity equal to that embodied in the rest of the instru-

ment. It follows that the court did not err in computing the period of the sale as it did.

 Appellant's seventh assignment of error is directed to the trial court's refusal to grant a new trial for the purpose of reopening the case and receiving in evidence two advertisements published by respondent on May 19th and 26th, in which it was stated that the closing-out sale would be terminated May 28th. Appellant's counsel stated, in an affidavit supporting the motion, that he had no knowledge of the existence of these advertisements prior to the closing of the trial. The record fails to disclose an application to the trial court, subsequent to the trial, to reopen the case for the limited purpose of admitting these advertisements. There are two reasons why the denial of appellant's motion was not error: (1) The matter of reopening the case for the limited purpose is raised for the first time on appeal and will not be considered. *Lewis Pac. Dairymen's Ass'n v. Turner,* 50 Wn. (2d) 762, 314 P. (2d) 625 (1957); *Johnson v. Seattle,* 50 Wn. (2d) 543, 545, 313 P. (2d) 676 (1957). (2) On the issue of granting a new trial generally, the trial court ruled that due diligence on the part of appellant (not his counsel) had not been shown. We cannot say that the trial court abused its discretion in denying the motion on this ground.

The remaining assignments of error relate to damages awarded, appellant contending that the measure of damages applied was improper, and that failure of the trial court to award appellant the seven-hundred-dollar balance, admittedly due him for services rendered prior to the breach of the contract, was error.

 In this connection, we are not unmindful of the desired object of compensatory damages in all actions for breach of contract, as expressed in *Rathke v. Roberts,* 33 Wn. (2d) 858, 207 P. (2d) 716 (1949), wherein we quoted, with approval, McCormick on Damages 560, § 137, that:

" 'In the case of a breach of contract, the goal of compensation is not the mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargain—the attempt to place the plain-

*tiff in the position he would be in if the contract had been fulfilled.'* (Italics ours.)"

We have before us a contract of employment, by which appellant agreed to perform certain services of a special character, involving somewhat unusual talent, skill, and experience in promotional salesmanship. But the services of appellant were not intended to be personal, in the sense that they could not be delegated, because the sale was to be conducted by appellant's "special sales manager," and the *personal* obligation of J. L. Knox to perform was not intended to arise unless the goods had not been disposed of within thirty days after the sale began. However, since merchandise remained to be sold after the expiration of that period, appellant was personally obligated to continue the sale until the remaining merchandise was sold, without cost to respondent. He failed to do so.

█ The measure of damages for breach of a contract to render personal services is stated in 5 Corbin on Contracts 435, § 1096:

"In the case of a total breach of a contract for personal service by an employee, the employer has the usual alternative remedies of damages or restitution. His recoverable damages include the cost of obtaining other service equivalent to the service that was promised and not performed, and compensation for additional consequential injury that the employee had reason to foresee as the result of his breach when the contract was made. Of course, the plaintiff's recovery must be reduced by the amount of the wages that remain unpaid and that the employer would have had to pay in case of full performance of the contract."

See *Roth v. Speck,* D. C. Mun. App., 1956, 126 A. (2d) 153; *Mendenhall v. Davis,* 52 Wash. 169, 100 Pac. 336, 21 L. R. A. (N.S.) 914; *Cahalan Inv. Co. v. Yakima Central Heating Co.,* 113 Wash. 70, 193 Pac. 210; *Marcus v. Liner,* 85 Misc. 368, 147 N. Y. S. 458; and *Cannon Coal Co. v. Taggart,* 1 Colo. App. 60, 27 Pac. 238.

Respondent contends that the damages awarded were proper because of the unique character of the contract and attending circumstances. We must agree to the extent that, if, in his attempt to mitigate damages, respondent re-

moved the unsold merchandise to the Yakima store and it became depreciated because of damage resulting therefrom, that factor should be considered in assessing damages. But the rule above quoted includes the element of consequential damages, which must have been within the contemplation of the parties, in addition to "the cost of obtaining other service *equivalent* to the service that was promised and not performed." We, therefore, conclude that the measure of damages approved by Mr. Corbin is applicable to the factual situation presented in this case.

Our attention is not called to any decision which would support the award of damages made by the trial court. In the absence thereof, we assume, *arguendo,* that *some* award for depreciation of merchandise, resulting from moving the goods to Yakima, might be properly allowed as consequential damages. It is, however, difficult to conceive that any substantial award for the depreciated value of the goods was within the contemplation of the parties at the time they executed their contract, because there is no provision or intimation therein that appellant was obliged to *buy* the goods remaining on hand at the end of the thirty-day sale. Appellant's only obligation was to "continue sale until stock is sold," free of charge, taking full charge of and managing the sale, using his "best efforts and endeavors" to sell the remaining merchandise at Toppenish at prices set by respondent.

Respondent testified that, after the first week of the sale, sales began "slipping, slipping, slipping, slipping," and that he could see that the stock would not be sold before the end of the sale, May 28th, giving that as one of the reasons for withholding the payments due appellant on May 21st and 28th. Hence, even if appellant had not breached his contract by failing to continue the sale, respondent may have found it to his advantage to remove the remaining goods to Yakima as a conservation measure, thereby eliminating the operating expenses of the Toppenish store. But the record is silent as to whether respondent would have acted differently if appellant had arrived on May 31st and had offered to continue the sale.

Nevertheless, the fourth finding of fact entered by the trial court reads, in part:

"That by reason of the breach of contract by the [appellant] damage was sustained by the [respondent] herein as follows:

"1. That at the time the [appellant] breached the contract, unsold stock was on hand having a fair value of $15,226.74.

"2. That the stock decreased in value by fifty (50) per cent by reason of the [appellant's] failure to continue sale of the stock, free of charge as required under the 'Articles of Agreement.' That the [respondent] thereby suffered losses in the sum of $7,613.37. . . ."

In support of this finding, an inventory of the stock of goods on hand (respondent's exhibit No. 2), together with a balance sheet showing a depreciation of fifty per cent of the value of the inventoried goods (respondent's exhibit No. 2A), was offered and admitted in evidence without objection, respondent's counsel stating:

". . . and at the present time I am offering only to show, as Mr. Winkenwerder testified, the total figure of $15,226.74 is the inventory of the stock shown in Identification 2 and 2-A, . . . just for this purpose only at the present time."

Thus, the inventory was admitted in evidence only for the limited purpose of showing the value of the goods remaining on hand after the close of business, May 28th.

Respondent testified that $15,226.74 represented the "cost" price of the remaining goods. He thereafter testified as follows:

"Q. Continuing with paragraph 1 of the bill of particulars, 'but by failing to continue said sale, said inventory decreased in value by 50%, thereby the plaintiffs suffered loss of $7,613.37'. How do you figure that this stock of merchandise decreased fifty per cent in value? A. Why, by having to transfer it. You can't take a stock of merchandise like that that is all out of the boxes, load it into baskets and haul it up here, and there was merchandise in that stock that is not carried in this stock here, and we do not sell it here because we do not have the lines in industry that they have down there. It becomes shopworn. Q. Was there any

method available for you to dispose of this stock during that first week of June, 1955, other than bringing it to the Yakima store? A. No. Q. Now, do you recall how much it cost to move the merchandise and stock up to Yakima, and to whom it was paid? A. To Lloyd Krouse, the amount was paid. If I am not mistaken, it was around $190.00. I could be mistaken in that. Q. Was there any other expense involved in the moving? A. Oh, yes. I had to pay my boys a lot of overtime, going down there nights, and working nights and working Sundays to get the merchandise out."

On cross-examination, respondent testified:

"Q. Well, now, Roy, what did you do with all those goods? Did you bring them up to the Yakima store? A. Yes, we brought them to the Yakima store. Q. Did you put them on the shelves? A. Yes. Some of them are still down in the basement, Pete, with sales tags on them that Mr. Denchfield put on them. Q. What you put on the shelves, you sold that at the regular retail prices here? A. No, we couldn't, for the simple reason that a lot of this merchandise was marked with chalk or black pencil markings, and when that hits the metal, there is a certain acid in that that goes into the metal, and you can't remove it. We still have a lot of that merchandise in stock down there. Q. That is because it is not saleable? A. Yes, that's right. We don't have that type of market up here. Q. What is there you can't sell here that you can in the Toppenish area? A. We don't sell a lot of game traps up here. We sell a lot down there because they are on the Reservation, and there are certain types of steel goods you can't sell up here because of the difference in the crops, beet hoes and that sort of thing. We don't have that type of crop up here at all. Q. You have that up here, however—A. (Interposing) That's right, and we couldn't sell it at the regular retail price that we had because hauling stuff up in boxes —for instance, your wife comes in the store, and you see an article up here and it is damaged, you are not going to pay the regular retail price. Q. But you did sell quite a bit of the goods up here? A. Yes. Q. And you say you have some traps up here for which there is no market? A. That's right. Q. Could you tell us how long you might have had those down there before selling them? A. No, I couldn't. Q. You had them in stock? A. Yes. Q. And you say there are a lot of other items? A. Oh, yes, there are a lot of other items, that's right. Q. And you have them in the

store here? A. Yes. Q. But the majority of the stock you did dispose of up here? A. That's right."

The foregoing testimony of respondent points out the tenuous basis for the amount of damages awarded (fifty per cent of the cost price of *all* unsold merchandise). First, if a part of the merchandise had a reduced value (or were wholly valueless) in Yakima (only twenty miles from Toppenish) because of differences in customer demand between those cities, respondent would not be mitigating his damage by repacking the goods and shipping them to Yakima at appellant's expense. Second, if, because of the moving, respondent was required to pay his employees overtime in getting the merchandise ready for shipment, respondent's expenditures in this connection should be susceptible to reasonably accurate computation. And, third, if some of the merchandise was not readily saleable in Yakima because of chalk or black pencil markings, appellant should not be held liable therefor, because the markings were put on the merchandise while it was still at the Toppenish store and prior to appellant's breach of contract.

■ ■ A review of the record supporting the amount of damages awarded compels the conclusion that the evidence presented is too vague, indefinite, and uncertain as to afford a proper foundation for such damages. Furthermore, the inventory values were admitted for a limited purpose and later used by the trial court for an entirely different purpose, to wit, to force appellant to pay half of their inventoried price, while respondent was permitted to keep the goods and ultimately sell them in Yakima. Hence, because of the erroneous assessment of damages, a new trial, limited to that issue, must be granted. *Winslow v. Mell,* 48 Wn. (2d) 581, 295 P. (2d) 319 (1956).

■ On appellant's cross-complaint, the record shows that respondent failed to make payments of three hundred fifty dollars each on May 21st and 28th, which became due prior to appellant's breach. We need not discuss whether or not respondent's failure to pay these installments as they matured constituted separate breaches of the contract justifying appellant's failure to perform, as this issue was not

presented to the trial court (*Johnson v. Seattle, supra*), and we consider it waived.

█ █ However, by respondent's own admission, appellant was entitled to a total of seven hundred dollars on May 28, 1955. Respondent's apprehension of an impending breach of the contract by appellant is not sufficient justification for his own default, particularly where that default could have been a factor inducing appellant's breach of the contract. Since the two unpaid installments constitute liquidated demands admittedly due, interest thereon would ordinarily commence to run from the date upon which they respectively matured. *Mall Tool Co. v. Far West Equipment Co.*, 45 Wn. (2d) 158, 273 P. (2d) 652 (1954).

The judgment is reversed, and the cause is remanded with directions to enter a judgment forthwith in favor of appellant in accordance with the prayer of his cross-complaint, and to grant a new trial, limited solely to the issue of damages, as to respondent's cause of action.

Appellant, having substantially prevailed in this court, shall recover costs.

HILL, C. J., ROSELLINI, FOSTER, and HUNTER, JJ., concur.

February 25, 1958. Petition for rehearing denied.