

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE___DEC 12 2013

CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on December 12, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARGIE (MEG) JONES, as Guardian of MARK JONES, | NO. 87343-7 |
| Respondent, | |
| v. | EN BANC |
| CITY OF SEATTLE, | |
| Petitioner. | Filed _____ DEC 12 2013 |

GORDON McCLOUD, J.—The city of Seattle (City) seeks review of an unpublished Court of Appeals decision affirming a $12.75 million verdict in favor of former Seattle fire fighter Mark Jones. The City asserts that the trial court erred by (1) excluding three late-disclosed defense witnesses without first conducting the inquiry required under *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997) and (2) denying the City's motion to vacate the judgment on the basis of newly discovered evidence. Although we find that the trial court erred in excluding testimony by the late-disclosed witnesses, we agree with both parties that

this evidentiary ruling is reviewed for harmless error and we conclude that the error was harmless. We also find that the trial court did not abuse its discretion in denying the City's motion to vacate. We therefore affirm the judgment of the trial court.

FACTS

Mark Jones, a Seattle fire fighter, was severely injured on December 23, 2003, when he fell 15 feet through a fire station "pole hole" at approximately 3 a.m. Clerk's Papers (CP) at 7987-90. Although he could not remember the accident, he reported to a responding medic that he had awoken to use the bathroom, which was next to the pole hole door. 6-B Report of Proceedings (RP) (Sept. 17, 2009) at 149-50. Mark[1] sustained both physical and cognitive impairments as a result of his fall. In December 2006, Mark sued the City for damages arising from the accident, alleging that the City had been negligent in failing to block the door to the fire pole. Trial was continued twice and eventually set for September 8, 2009. The court made July 20, 2009 the discovery cutoff date and ordered the parties to exchange final witness lists by August 17, 2009. The continuances were granted in part because the

---

[1] Because this case involves multiple members of the Jones family, we refer to Mark Jones, the plaintiff Meg Jones, and Mark's and Meg's father, Gordon Jones, by their first names to avoid confusion.

City substituted new counsel twice after the lawsuit was filed. The attorneys who represented the City at trial took over in January 2009.

The City deposed Mark on March 6, 2008, and his sister Meg Jones on March 10. In October 2008, Meg was appointed Mark's guardian; she thereafter moved the court to substitute herself as plaintiff in the case. The court granted the motion. On May 4, 2009, the City moved for permission to redepose Mark, arguing that its current counsel had never met or questioned him and that it should be allowed to ask him about his activities during the year that had elapsed since his first deposition. Meg opposed the motion, arguing that the City did not need to "meet" Mark when it had a videotape of his first deposition, had all his current medical records, and had a list of 162 witnesses whose knowledge of Mark's current condition had been described by both Meg and Mark in their depositions. CP at 222-33. Meg also argued that Mark's condition was unchanged, and that another deposition would be an extreme physical and emotional hardship for him. The trial judge denied the City's request for a second deposition.

When the City hired its third and final set of attorneys, it began aggressively pursuing the theory that Mark was an alcoholic and a binge drinker who had fallen through the pole hole because he was suffering from symptoms of alcohol withdrawal. As trial grew closer, the City also began asserting that Mark's

3

alcoholism was compromising his recovery. The City's "alcohol theory" was apparently based on three things: Mark's DUI (driving while under the influence of intoxicating liquor or any drug) arrest in November 2003, deposition testimony by Mark's ex-wife that Mark had been a heavy drinker before his accident, and the fact that when Mark was admitted to Harborview Medical Center after his fall, doctors there implemented alcohol withdrawal protocols.

In fact, Mark's DUI charge was reduced to negligent driving. Further, the attending physician at Harborview submitted a declaration explaining that the alcohol withdrawal protocols had been initiated in response to Mark's extreme agitation upon arrival, but that in retrospect she believed those symptoms were more likely caused by the brain injury Mark sustained in the fall, rather than by alcohol-dependence. Finally, Mark's ex-wife stated in a deposition that while Mark drank heavily at times during their marriage, he had not consumed any alcohol in the two months preceding his accident.

The City nevertheless offered testimony by Dr. Gregory Rudolf, who had never met Mark, that Mark "was the kind of alcoholic who conceals his drinking" and that "alcohol was the cause of [Mark's] abnormal level of disorientation" the night of the accident. RP (Sept. 4, 2009) at 57; CP at 2372-86.

On the first day of trial, the judge excluded evidence of preaccident alcohol consumption, finding that "the probative value of that [evidence] is minimal, [while] the prejudice is very, very significant." RP (Sept. 4, 2009) at 113. She also excluded evidence that Mark had been drinking since his accident, with the exception that "if the defense wants to argue that factors other than [his] injuries . . . have diminished [Mark's] quality of life," it could elicit first-hand testimony about two incidents of alleged heavy drinking in mid-2006. *Id.* at 115. She left open the possibility that she would admit more evidence of drinking if it were "pretty strong," *id.*, and if the City could better "articulate[] what happened to [Mark's] recovery as a result of using alcohol." *Id.* at 117.

The following week, after reviewing "every single case that [she] could find that has any bearing on [the alcohol issue]," the judge excluded the City's proffered expert testimony in support of its theory that Mark's alcoholism was compromising his recovery. RP (Sept. 11, 2009) at 144-46. In issuing this ruling, she cautioned the City that she was concerned about the evolving and speculative nature of its "alcohol theory" defense:

> Post accident, I'm concerned that even getting into the question of alcohol's impact on Mr. Jones' recovery and on his quality of life, basically, was an idea that came up recently, when it became clear that maybe the pre-accident use of alcohol wasn't going to come in, and I'm very concerned that Dr. Rudolph [sic] testified that he refined and sort of developed these opinions after his deposition on July 24th.

5

> Dr. Rudolph [sic] certainly did not have any proof [of post-accident drinking], simply his assumption and suspicion that alcohol was continued to be used . . . and it's simply too speculative to consider it, especially when we consider the tremendous prejudicial effect that getting into alcohol can have.

*Id.* at 146-47. The judge maintained her prior ruling as to the two incidents of heavy drinking in 2006.

On the same day the judge issued her ruling excluding Dr. Gregory Rudolf's testimony—three days after trial began—the City moved to admit testimony by Mark's sister, Beth Powell. The City explained that it had only "learned of [Powell] yesterday" and that it had flown her in from Helena, Montana, that morning. *Id.* at 104. The judge expressed concern over what she characterized as "an ambush" on the plaintiff: "the way we have our civil rules designed is that people are allowed to rely on what evidence has been presented by the discovery cutoff . . . ." *Id.* at 111. The City complained that it would have discovered Powell earlier, if it had been permitted to re-depose Mark. It also asserted, for the first time, that it had "pictures of [Mark] last Sunday night . . . sitting at a bar." *Id.* at 114.

The judge ordered the parties to depose Powell over the weekend and deferred ruling on Powell's testimony until she could read the deposition. She also ordered the City to turn over any surveillance photographs it had of Mark or Meg.

The parties gave their opening statements the following Monday. The first two weeks of trial were devoted to testimony by Mark's treating physicians, a member of the workers' compensation panel who had evaluated Mark after his accident, and various witnesses who spoke to the general condition and layout of "Station 33," to the City's ability to prevent accidents like Mark's, and to Mark's demeanor, habits, and capabilities since the accident.

The various physicians and therapists who took the stand uniformly testified that Mark had significant and permanent cognitive impairments. Dr. Peter Esselman, a brain injury specialist who had treated Mark at Harborview's inpatient rehabilitation unit, testified that Mark had sustained a traumatic brain injury in his accident and that this injury was manifesting in Mark's difficulties managing day-to-day tasks, concentrating, and controlling his mood. He also testified that Mark suffered from lasting nerve damage and that Mark had made significant efforts to return to work, which had been frustrated by his brain injuries. Dr. Esselman also stated that Mark would probably not be able to function without "some sort of companion care right now to help him with daily structure[,] . . . taking medications on time[,] . . . meal preparation[,] . . . and schedul[ing]." He testified that he knew that Mark continued to drive a car and that this worried him.

Dr. Leonard Hudson, a pulmonary care specialist and Mark's treating physician, testified that Mark's lung capacity had been significantly decreased as a result of his injuries, that this condition was worsening over time, and that he had treated Mark for "panic attacks" he suffered as a result of his breathing problems. 5 RP (Sept. 16, 2009) at 202-03. Dr. Gary Stimac, a neuroradiologist, testified that a brain injury resulting from a fall could result in long-term symptoms such as confusion and lack of focus, which would worsen over time.

Dr. Andrew Friedman, a rehabilitation and pain medicine physician at Virginia Mason Medical Center, testified that he had seen Mark regularly since 2004 and that Mark's brain injury, breathing problems, and chronic pain had frustrated his diligent efforts to return to full-time work. He also testified that the three physicians on the workers' compensation panel who had examined Mark on the City's behalf— "an orthopedist, neurologist, and a psychiatrist"—had concluded that Mark could not be gainfully employed. 6-A RP (Sept. 17, 2009) at 37, 39. Dr. John Stump, the neurologist on the workers' compensation panel, testified that neither he nor the other two physicians on the panel found any evidence that Mark was exaggerating his impairments. He also testified that the panel had found Mark "unemployable" in any capacity, but capable of "perform[ing] activities"—including pushing,

8

pulling, and occasionally lifting up to 50 pounds—for about five hours per day. 7 RP (Sept. 21, 2009) at 155-56.

Anthony Choppa, Mark's vocational rehabilitation counselor, testified that Mark's pain, fatigue, and cognitive impairments limited his employability and that Mark's cognitive impairments made it difficult for Mark to "make judgments, have insights, plan[,] and follow through . . . ." 8 RP (Sept. 22, 2009) at 110. He also testified that Mark struggled with anxiety and fear, that the severity of his cognitive symptoms varied from day to day, and that Mark's doctors were generally concerned about the fact that he continued to drive a car. Dr. Glen Goodwin, a neuropsychologist retained by the plaintiff, testified that Mark's brain injuries were manifesting in susceptibility to fatigue, decreased sensation, confusion, slow thinking, and spatial disorientation.

Finally, Dr. Joanne Brockway, Mark's rehabilitation psychologist, testified that Mark's cognitive impairments interacted with his depression and anxiety so that he was "slow to learn [therapeutic] concepts" and that Mark's depression stemmed from "the accident itself, and also from the loss of things . . . [such as] his job, . . . social support group, . . . [and] his sense of himself as a competent . . . individual . . . ." 9 RP (Sept. 23, 2009) at 199-213. Dr. Brockway testified that "with appropriate therapy and other resources," Mark might be able to function more independently in

the future, but that she thought "he will always need some supervision . . . with structure . . . [to] engage in activities that can help make life worthwhile to him . . . ." *Id.* at 216. She also stated that Mark would benefit from the services of a "daily attendant" to help him get to his appointments and remind him to take his medications, and she noted that Meg was currently "providing that structure." *Id.* at 217. She testified that Mark had never come to an appointment in her office alone.

On September 28, two weeks after opening statements, the City filed a declaration by Mark's father, Gordon Jones, and offered his testimony. Although the City had never listed Gordon as a witness, his name had appeared on Meg's list of "potential witnesses." CP at 7626. In addition to being Mark's father, Gordon was a physical therapist who had provided therapy to Mark for more than two years following the accident. Gordon had billed the City for the therapy he provided to his son, but the City claimed it had no reason to seek information from Gordon until he suddenly came forward three weeks into trial.

Gordon's declaration asserted that Mark had struggled with alcohol addiction since he was a teenager, that this addiction was hindering Mark's recovery, that some of Mark's cognitive impairments were due to alcoholism rather than the firehouse accident, and that if Mark received a large sum of money he would "not be able to heal," presumably because he would spend it on alcohol. CP at 4075. Gordon also

claimed that Mark and Meg were "not being truthful with the court with respect to Mark's injuries and overall physical and mental health issues" and that Meg "enabled" Mark's alcoholism. CP at 4068, 4070.[2]

Powell's deposition echoed many of the themes in Gordon's. Although Powell testified that she had not actually spent any time with Mark since 2006, she nevertheless opined that Mark had an ongoing drinking problem. She asserted that Mark had been an alcoholic since he was a teenager, that Meg enabled his drinking, and that Mark would spend any money he won in the lawsuit on alcohol. Powell also claimed to have observed Mark performing various physical tasks, such as moving a canoe and building shelves, as she drove by their sister Tammy's house in Helena.

After sending the jury home on September 28, the trial judge stated her intent to rule on Gordon's and Powell's testimony the next day. She scheduled a hearing for the following morning, telling the parties that her "only focus" at the hearing

---

[2] In response to Gordon's declaration, Meg filed a declaration asserting that although she and Mark were grateful to their father for the physical therapy he had provided, they had discontinued the therapy after Mark's condition plateaued in 2006. Meg maintained that Gordon had become frustrated by Mark's slowed progress, that he resorted to "negative reinforcement" in response, and that he objected on principle to the narcotic pain medication Mark's doctors had prescribed because Gordon was a "big believer in holistic medicine." CP at 6658-59. She also cited a "financial dispute" as one reason she and Mark had not seen their father since 2006. CP at 6659.

11

would be "compliance with the local rules and how in the world I could entertain any witnesses that are coming up during trial." 11 RP (Sept. 28, 2009) at 225.

The relevant "local rules" are King County Local Rule (KCLR) 4 and former KCLR 26(b)(4) (2007).[3] KCLR 4(e) sets forth the procedures for establishing and modifying a "civil case schedule"; KCLR 4(j) requires parties to exchange witness lists "no later than 21 days before the scheduled trial date" and states that "[a]ny witness or exhibit not listed may not be used at trial, unless the Court orders otherwise for good cause and subject to such conditions as justice requires." Former KCLR 26(b)(2), (3) establishes the scope of witness disclosure and requires parties to disclose additional witnesses—"persons whose knowledge did not appear relevant until the primary witnesses were disclosed"—no later than the deadline set in the case schedule pursuant to KCLR 4(e). Former KCLR 26(b)(4) states that "[a]ny person not disclosed in compliance with this rule may not be called to testify at trial, unless the Court orders otherwise for good cause and subject to such conditions as justice requires."

On the morning of September 29, the judge heard arguments regarding Powell's and Gordon's testimony. She opened the hearing by telling the parties to

---

[3] When the trial court heard Mark's case, this rule was listed as KCLR 26(b)(4). It was relisted as KCLR 26(k)(4) when the local rules were updated on September 1, 2011, but its language remains the same.

address only disclosure issues, noting that "relevance I've already dealt with." 12-A RP (Sept. 29, 2009) at 3. This was an apparent reference to the fact that the overwhelming majority of both Powell's and Gordon's proffered testimony concerned Mark's alleged alcoholism.

The City argued that its late disclosure was not a willful violation of the discovery rules. With respect to Powell, it claimed that it could have done a better investigation if it had been allowed to depose Mark a second time:

> We didn't have any information coming from any of his treaters that he was [using] alcohol. We only had information from his own mouth and from the plaintiffs that he wasn't a drinker, that there was no problem with drinking in this case. So these are things that we've had to discover ourselves through the course of discovery, and given that we couldn't redepose him at any time[,] . . . the alcohol has not been anything that's been given to us in any testimony from anybody.

*Id.* at 10. With respect to Gordon, the City claimed that it had no idea that his testimony might be relevant, until Gordon suddenly decided to "speak[] his conscience . . . [and] come forward . . . [because] he knows it's the right thing to do." *Id.* at 13. The City also claimed that it had previously disclosed Gordon anyway, by reserving the right to call opposition witnesses.

Meg responded that a "boilerplate" reservation of rights was not a proper disclosure under the local rules. *Id.* at 16, 22. She argued that the City only wanted

to bring in Powell and Gordon—from whom Mark had become estranged because of an ongoing business dispute with his father—to "spew venom." *Id.* at 19.

The judge provisionally excluded Powell's and Gordon's testimony. The reasons she gave for this ruling are discussed in detail in the analysis section below, but they included her determination that the City had not made the "good cause" showing required by the local rules:

> [T]here is just absolutely no way I can see, under our local rules, to allow Ms. Powell to testify. It's beyond—I can't even find a case where a late disclosure was so late, and certainly there has not been good cause established . . . .
>
> Gordon Jones is a slightly closer situation . . . [but] the rules are there to try to enable—it's to try to be fair to both sides, and in this case[,] I've been pretty firm about excluding witnesses and testimony that's late disclosed. That's true for [the plaintiff's witnesses] . . . .
>
> . . . .
>
> I can't find that the City has shown good cause for why this was so late disclosed, and the prejudicial effect is dramatic, coming in almost at the end of the plaintiff's case. . . . I understand what the City's trying to do, but it is simply too late, and so I'm not going to allow [Gordon] to testify.

*Id.* at 23-25.

In spite of this ruling, the judge continued to consider the possibility of allowing Gordon to testify that he had once heard Mark describe a night of sleep as "pain-free." 13 RP (Sept. 30, 2009) at 64-72; 16 RP (Oct. 8, 2009) at 210-15; 19 RP

(Oct. 14, 2009) at 9-11. Ultimately, the judge determined that this was unnecessary, since Mark did not deny making that statement when he testified.

As trial wore on, the City continuously offered the testimony of the investigator, Rose Winquist, who had taken pictures of Mark at a bar the night before the trial started. The judge continued to exclude Winquist.

The jury returned a verdict for Mark on October 22, 2009, awarding him $12.75 million and finding that the City's negligence was the sole cause of his injuries. This judgment included $2,433,006 for future medical-related care and $10,000,000 for noneconomic damages. The City immediately moved for a new trial under Civil Rule (CR) 59, which the trial court denied on January 21, 2010.

Several months later, the City moved to vacate the judgment under CR 60(b)(3), on grounds of newly discovered evidence, and CR 60(b)(4), on grounds of fraud. This motion was based on several hours of posttrial surveillance video showing Mark engaging in physical activities that the City asserted were incompatible with his testimony at trial. The City also submitted videos it had edited, which juxtaposed clips from Mark's 2008 deposition with surveillance video taken in 2010. On October 18, 2010, the trial judge denied the City's motion to vacate.

The City appealed, arguing that the trial judge had abused her discretion in excluding Powell's, Gordon's, and Winquist's testimony. The City also argued that the trial judge erred in denying its motions to vacate.

In early 2012, Division One of the Court of Appeals affirmed in an unpublished opinion. *Jones v. City of Seattle*, noted at 166 Wn. App. 1027 (2012). The City petitioned this court for review, arguing that the Court of Appeals' decision conflicted with this court's holdings in *Burnet*, 131 Wn.2d 484 and *Mayer v. Sto Industries, Inc.*, 156 Wn.2d 677, 688, 132 P.2d 115 (2006). Under those cases, a trial judge must perform a specific, on-the-record analysis before excluding witnesses for late disclosure. *Id.*; *see also infra* section I. In its petition to this court, the City abandoned its argument under CR 60(b)(4) but maintained its argument regarding the denial of its CR 60(b)(3) motion to vacate due to newly discovered evidence.

## STANDARD OF REVIEW

The City seeks a new trial on damages only, not on liability. All of the rulings it challenges are subject to review for abuse of discretion. *Mayer*, 156 Wn.2d at 684 (trial court's exclusion of witnesses will not be disturbed absent a clear abuse of discretion (citing *Associated Mortg. Investors v. G.P. Kent Constr. Co.*, 15 Wn. App. 223, 229, 548 P.2d 558 (1976))); *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576,

580, 599 P.2d 1289 (1979) (motion to vacate is addressed to the sound discretion of the court). At oral argument, both parties acknowledged that the rulings on witness exclusion are subject to review for harmless error.[4] We agree. *Thornton v. Annest*, 19 Wn. App. 174, 181, 574 P.2d 1199 (1978).

## ANALYSIS

I.   The Trial Court Erred in Excluding Three Witnesses Without Performing the *Burnet* Inquiry, But the Error Was Harmless

A trial court's discretion to exclude witnesses is cabined by this court's holdings in *Burnet* and its progeny. In *Burnet*, this court held that before imposing "'one of the harsher remedies allowable under CR 37(b)'"[5] (quoting *Snedigar v. Hodderson*, 53 Wn. App. 476, 487, 768 P.2d 1 (1989), *aff'd in relevant part*, 114 Wn.2d 153, 169 & n.37, 786 P.2d 781 (1999)), the trial court must explicitly consider whether a lesser sanction would probably suffice, whether the violation at issue was willful or deliberate, and whether the violation substantially prejudiced the opponent's ability to prepare for trial. *Burnet*, 131 Wn.2d at 494. The sanction

---

[4] Wash. Supreme Court oral argument, *Jones v. City of Seattle*, No. 87343-7 (June 13, 2013), at 14 min., 31 sec., *video recording by* TVW, Washington State's Public Affairs Network, *available at* http:www.tvw.org ("[W]e know harmless error needs to be shown once there's a trial."); *id.* at 27 min., 31 sec. ("I think [a *Burnet* violation] should be subject to a harmless error review.").

[5] CR 37(b) lists various sanctions that a court may impose for a party's failure to comply with a court order.

imposed in *Burnet* was a protective order limiting discovery as to a particular claim. *Id.* at 490-91.

In *Mayer*, 156 Wn.2d at 688, this court held that *Burnet* applies to witness exclusion: when imposing a severe sanction such as witness exclusion, "the record must show three things—the trial court's consideration of a lesser sanction, the willfulness of the violation, and substantial prejudice arising from it."

More recently, this court applied *Burnet* in *Blair v. TA-Seattle E. No. 176*, 171 Wn.2d 342, 254 P.3d 797 (2011) (*Blair* II). In *Blair* II, this court reversed a decision in which Division One of the Court of Appeals performed the *Burnet* analysis that the trial court had omitted. *Blair* II, 171 Wn.2d at 351; *see also Blair v. TA-Seattle E. No. 176*, 150 Wn. App. 904, 909, 210 P.3d 326 (2009) (*Blair* I), *rev'd, Blair* II, 171 Wn.2d 342 ("Although the trial court did not enter findings on the record demonstrating its consideration of the *Burnet* factors, the record before us provides adequate grounds to evaluate the trial court's decision in imposing discovery sanctions."). This court held that the Court of Appeals had erred in concluding that it could "consider facts in the first instance as a substitute for the trial court findings that our precedent requires." *Blair* II, 171 Wn.2d at 351.[6]

---

[6] When the trial court heard Meg's case, this court had not yet reversed Division One's decision in *Blair* I. At trial, Meg cited *Blair* I on at least two occasions but never for its holding that an appellate court could conduct the *Burnet* analysis in the first instance.

While Division One was considering the City's appeal in this case, this court issued its decision in *Blair* II, reversing Division One's decision in *Blair* I. *See Blair* II, 171 Wn.2d 342; *Jones*, noted at 166 Wn. App. 1027. Although *Burnet* had played a relatively minimal role in the City's initial briefs to the Court of Appeals,[7] after this court issued its opinion in *Blair* II, both parties submitted supplemental briefing devoted to *Blair* II and the *Burnet* analysis. Suppl. Br. of Resp't; Appellant's Suppl. Br. Regarding *Blair v. TA-Seattle East No. 176*.

In affirming the decision to exclude testimony by Powell, Gordon, and Winquist, the Court of Appeals held that the trial court was entitled to rely on Division One's subsequently overturned decision in *Blair* I. It opined that this court's later endorsement of "a different procedural approach" did not apply

Rather, Meg invoked *Blair* I for two principles that this court did not subsequently overrule (or even address) (1) that a reservation of the right to call the opposition's witnesses does not fulfill substantive disclosure requirements under the local rules and (2) that a court may not exclude witnesses as a sanction for discovery violations absent a finding that the violations were willful.

[7] In its original, 96-page brief to the Court of Appeals, the City mentioned *Burnet*'s "lesser sanctions" analysis only once, where it argued that Winquist's evidence had been improperly excluded. Appellant's Opening Br. at 52 (citing *Burnet* and four other cases for the rule that "Washington law requires both findings [of willfulness and prejudice] *and* an on-the-record balancing of potential sanctions before testimony is excluded"). The plaintiff responded by arguing, as she did before this court, that the trial judge's numerous colloquies satisfied *Burnet*'s requirements. Br. of Resp't at 58 ("Even assuming *arguendo* that the trial court had to apply the *Burnet* test, it properly excluded Winquist.").

19

retroactively to invalidate an otherwise proper ruling. *Jones*, noted at 166 Wn. App. 1027 at *14-15.

That holding was error. Leaving aside any questions of retroactivity, this court did not make new law when it reversed *Blair* I. As this court noted in *Blair* II, it has been clear since at least 2006 that trial courts must consider the *Burnet* factors before excluding witnesses. *Blair* II, 171 Wn.2d at 349 (citing *Mayer*, 156 Wn.2d at 688). When Division One held otherwise, it misread *Mayer*.

The Court of Appeals also held that the trial court's multiple colloquies on Powell, Gordon, and Winquist fulfilled *Burnet*'s substantive requirements. *Jones*, noted at 166 Wn. App. at *14-22. Before undertaking our analysis, we note that this court has previously found *Burnet* violations only where a trial court struck witnesses without conducting any meaningful inquiry into the reason they were disclosed belatedly or the consequences of excluding their testimony.[8] Here, by contrast, the trial judge devoted no fewer than nine separate colloquies to the issue

---

[8] *Blair* II, 171 Wn.2d at 348; ("there was no colloquy between the bench and counsel . . . [nor any] oral argument before the trial court entered its orders, and the orders themselves contain bare directives"); *Rivers v. Wash. State Conference of Mason Contractors*, 145 Wn.2d 674, 696, 41 P.3d 1175 (2002) ("[t]he trial court on the record did consider lesser sanctions, but only by stating in the order 'The court has considered lesser sanctions of terms and exclusion of testimony, but has determined that dismissal . . . is the only appropriate remedy'"); *Teter v. Deck*, 174 Wn.2d 207, 219, 274 P.3d 336 (2012) (defendant's "bare assertion" that plaintiff "had 'no reasonable excuse' for [its] late disclosure . . . cannot substitute for the trial court's [willfulness determination]").

of late disclosed witnesses.[9] While these colloquies evidenced a great deal of careful deliberation, however, they fell short of *Burnet*'s requirements. We therefore hold that the Court of Appeals erred when it concluded that the trial court complied with *Burnet*.

### A. The City did not properly disclose Gordon Jones as a witness

In addition to arguing that the trial court erred in excluding its late-disclosed witnesses, the City asserts that Gordon Jones was timely disclosed. It maintains that it properly disclosed Gordon as a witness by reserving the right to call any witness appearing on the plaintiff's list. We hold that this reservation did not constitute a proper disclosure because it did not satisfy the substantive requirements enumerated in the local rules.

In finding that Gordon was not timely disclosed, the trial judge relied on *Blair* I. In that case, as noted above, the Court of Appeals held that the plaintiff's "reservation of rights" to call defense witnesses was not a proper disclosure under former KCLR 26(b)(3)(A), (B) (2005). *Blair* I, 150 Wn. App. at 910-11. Although *Blair* I dealt with expert witnesses—a distinction the trial judge here acknowledged was "important," 12-A RP (Sept. 29, 2009) at 23—its logic applies to this case.

---

[9] *See* RP (Sept. 4, 2009) at 42-65, 116-25; RP (Sept. 11, 2009) at 103-16, 144-48; 12-A RP (Sept. 29, 2009) at 3-27; 13 RP (Sept. 30, 2009) at 64-72; 16 RP (Oct. 8, 2009) at 9-20, 209-16; 19 RP (Oct.14, 2009) at 9-17.

21

The local rules require parties to provide a list disclosing "primary" and "additional" witnesses in accordance with trial schedule deadlines. KCLR 26(k)(1)-(3); *see also Blair* I, 150 Wn. App. at 911. For expert witnesses, this list must include "[a] summary of the expert's opinions and the basis therefore and a brief description of the expert's qualifications." KCLR 26(k)(3)(C). For lay witnesses, it must include "[a] brief description of the witness's relevant knowledge." KCLR 26(k)(3)(B). In *Blair* I, the Court of Appeals ruled that a party could not use a "reservation of rights" to escape its responsibility to disclose the substance of or basis for a proffered expert's testimony. *Blair* I, 150 Wn. App. at 911.[10] Here, the City sought to use a similar reservation of rights, but it thereby avoided disclosing Gordon Jones's "relevant knowledge" under KCLR 26(k)(3)(B). While a "reservation of rights" is sufficient to disclose witness names, it is insufficient to disclose the substance of a proposed witness's testimony.

The City's failure to disclose Gordon Jones's "relevant knowledge" was particularly problematic because Gordon could have testified either as Mark's father or as his physical therapist. Sometimes, the City characterized Gordon as a

---

[10] The plaintiff in *Blair* I wanted the opponent's lay witness to testify as an expert in her case. The Court of Appeals held that this was not a proper disclosure because it would have permitted the plaintiff to "convert an adversary's nonexpert witness into an expert without complying with the rules." *Blair* I, 150 Wn. App. at 911.

concerned father. It argued that it could not have anticipated the need to call Gordon because he, like Beth Powell, had come forward only as trial began, to assert that Mark's lawsuit must fail because Mark was an alcoholic. At other times, the City appeared to seek Gordon's testimony as Mark's physical therapist, arguing that he should be permitted to testify "as to his treatment of Mark Jones." 19 RP (Oct. 14, 2009) at 10.

The trial judge correctly pointed out that these shifting theories only highlighted the insufficiency of the City's disclosure:

> I have thought long and hard about this, and I do not think it's appropriate to call Gordon Jones.
>
> As I discussed, it has to do with how he was disclosed. He was a witness disclosed on the plaintiff's witness list as a father, they elected not to call him, the defense has never—had never named him as a witness, didn't interview him until after the trial began, now wants to call him in his capacity as a treater, when if he was going to be considered a treater, the defense couldn't have talked to him in the first place, . . . [under the rule barring *ex parte* contacts with treating physicians].

*Id.* at 11.

Most significantly, however, the City's failure to disclose Gordon's "relevant knowledge" left the plaintiff with no ability to respond to his "explosive" allegations. 12-A RP (Sept. 29, 2009) at 24. Their appearance three weeks after the start of trial caused exactly the kind of surprise the civil rules are designed to prevent. This

23

surprise was in no way mitigated by the appearance of Gordon's name on the plaintiff's list of potential witnesses. The "relevant knowledge" the plaintiff had originally intended to elicit from Gordon was presumably not that Mark was a lifelong alcoholic. Whatever efficacy a "reservation of rights" might have in other circumstances, here the City used it to avoid its disclosure obligations under KCLR 26(k)(3)(B). The trial judge was correct to rule that the City did not properly disclose Gordon as a defense witness.

B. The trial court erred in excluding testimony by the City's three late-disclosed witnesses without first conducting the *Burnet* inquiry, but this error was harmless

The trial court excluded testimony by Powell and Gordon based on KCLR 4 and 26. These rules create a presumption that late-disclosed witnesses will be excluded absent "good cause." KCLR 4(j), 26(k)(4).[11] *Burnet* and its progeny require the opposite presumption: that late-disclosed testimony will be admitted absent a willful violation, substantial prejudice to the nonviolating party, and the

---

[11] KCLR 4(j) provides that "[a]ny witness or exhibit not listed [in accordance with Case Schedule deadlines] may not be used at trial, unless the Court orders otherwise for good cause and subject to such conditions as justice requires." KCLR 26(k)(4) provides that "[a]ny person not disclosed in compliance with this rule [and the Case Schedule] may not be called to testify at trial, unless the Court orders otherwise for good cause and subject to such conditions as justice requires."

insufficiency of sanctions less drastic than exclusion. *Mayer*, 156 Wn.2d at 688; *Burnet*, 131 Wn.2d at 494.

The local rules may not be applied in a manner inconsistent with the civil rules, and they are therefore subordinate to this court's holding in *Burnet*. *See Harbor Enters., Inc. v. Gunnar Gudjonsson*, 116 Wn.2d 283, 293, 803 P.2d 798 (1991) (citing *State v. Chavez*, 111 Wn.2d 548, 554, 761 P.2d 607 (1988)); CR 83(a). Trial courts have been required to perform the *Burnet* analysis before excluding witnesses for late disclosure since at least 2006. *Blair* II, 171 Wn.2d at 349 (citing *Mayer*, 156 Wn.2d at 688, 690). The appellate court's ruling to the contrary is incorrect.

Of course, the mere fact that a trial court does not cite *Burnet* before excluding witnesses is not dispositive; a colloquy might satisfy *Burnet* in substance even if the judge fails to invoke that case by name. With respect to Powell and Gordon, we find that the judge fulfilled *Burnet*'s requirements that she consider prejudice and lesser sanctions, but not its requirement that she consider willfulness. With respect to the investigator Rose Winquist, we find that the judge properly considered prejudice, but not willfulness or lesser sanctions. Therefore, the judge erred in excluding all three witnesses without a complete *Burnet* inquiry.

*1. Beth Powell*

Prejudice. Before excluding Powell's testimony, the trial court conducted dozens of pages of colloquy on the proffered testimony's prejudicial effect. The City first offered Powell's testimony three days after the start of the trial. In the colloquy that followed, the court framed the problem before it as a contest between the defendant's interest in presenting relevant evidence and the plaintiff's right to rely on pretrial disclosures in preparing his case:

> [T]he way we have our civil rules designed is that people are allowed to rely on what evidence has been presented by the discovery cutoff, through the depositions, through the interrogatories, et cetera, and they're not supposed to be ambushed, and this certainly looks like an ambush from that point of view.

RP (Sept. 11, 2009) at 111. When the court ultimately ruled on Powell's testimony, she emphasized that Powell's sudden introduction, "post-jury selection, just before opening statements," had been "a complete surprise," whose "prejudicial effect is dramatic." 12-A RP (Sept. 29, 2009) at 22-23, 25. This finding satisfied *Burnet*'s prejudice prong.

Willfulness. This court has held that a party's failure to comply with a court order will be deemed willful if it occurs without reasonable justification. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 584, 220 P.3d 191 (2009) (citing *Rivers v. Wash. State Conference of Mason Contractors*, 145 Wn.2d 674, 686-87 & n.54, 41 P.3d 1175 (2002)). It has more recently noted, however, that *Burnet*'s willfulness

prong would serve no purpose "if willfulness follows necessarily from the violation of a discovery order." *Blair* II, 171 Wn.2d at 350 n.3. Something more is needed.

Here, the trial judge interpreted the "good cause" standard in KCLR 4(j) and KCLR 26(k)(4) (former KCLR 26(b)(4)) to permit testimony by late-disclosed witnesses only when the offering party demonstrates "good cause to not have discovered the witness sooner." 12-A RP (Sept. 29, 2009) at 14. The City's late disclosure of Powell may well have been willful, but the record contains no explicit finding to that effect. Rather, it indicates that the judge believed she could not admit Powell's testimony *unless* the City demonstrated "good cause" for the late disclosure. By interpreting the "good cause" standard in this manner, the trial judge reversed the presumption of admissibility required under *Burnet*.

Lesser sanction. *Burnet* requires that a trial court consider lesser sanctions "that could have advanced the purposes of discovery and yet compensated [the opposing party] for the effects of the . . . discovery failings." *Burnet*, 131 Wn.2d at 497 & n.5. In this case, the record demonstrates that the trial judge considered means of compensating the plaintiff for the City's "ambush," other than total witness exclusion. Although the judge ultimately excluded Powell's testimony, she did so after ordering Powell's deposition, reading it, and determining that virtually none of Powell's highly prejudicial testimony was based on first-hand knowledge.

27

Further, the judge actually permitted the City to cross-examine Meg and Mark on Mark's ability to perform physical tasks that Powell claimed she witnessed. This ruling allowed the City to benefit from Powell's deposition despite its noncompliance with discovery rules.[12] These accommodations satisfy *Burnet*'s lesser sanctions prong. They demonstrate that although the judge applied the wrong legal standard when considering whether to admit late-disclosed witnesses, she nevertheless viewed total exclusion as a last resort.

### 2. Gordon Jones

Prejudice. The City first offered Gordon's testimony roughly three weeks into trial. The trial court excluded it because "the risks of unfair prejudice, perhaps to the point of a mistrial, are too great . . . ." 12-A RP (Sept. 29, 2009) at 28. She also determined that "an interplay" between substance and timing made Gordon's testimony unduly prejudicial. 13 RP (Sept. 30, 2009) at 69; 16 RP (Oct. 8, 2009) at 213-16; 19 RP (Oct. 14, 2009) at 11. No serious argument can be made that the trial court failed to consider prejudice in excluding Gordon's testimony.

---

[12] The judge took the opposite approach to Winquist, the investigator. She did not permit the City to cross-examine Mark on his interaction with Winquist the night before trial because, in her words, the City had no "witness who would be able to prove it up if he were to deny it." 16 RP (Oct. 8, 2009) at 12; *see also infra* section I.B.3.

Lesser sanctions. Although she excluded Gordon's alcohol-related testimony as soon as it was offered, the judge did not immediately rule out the possibility that Gordon might testify in rebuttal, regarding Mark's pain level. As with Powell, the judge did not exclude Gordon's testimony simply to punish the City for its failure to meet deadlines. Rather, she excluded his alcohol-related testimony as unduly prejudicial[13] and his testimony on Mark's pain level because it did not contradict Mark's or Meg's testimony.[14] By permitting the City to cross-examine Mark and Meg about Mark's pain level, the judge allowed the defense to benefit from information in Gordon's declaration, despite its untimely disclosure. This approach satisfies *Burnet*'s lesser sanctions prong.

Willfulness. Before making her initial ruling on Gordon's testimony, the trial judge inquired at length into the City's efforts to investigate Gordon's knowledge of Mark's alcohol consumption. The judge noted a contradiction between the City's assertion that "plaintiff has disclosed [Gordon] from the beginning, and . . . knew . . . what he was going to say," 12-A RP (Sept. 29, 2009) at 4, and the fact that the City

---

[13] *See* 13 RP (Sept. 30, 2009) at 69 ("There's like 99 percent of the declaration's completely inappropriate.").

[14] *See* 16 RP (Oct. 8, 2009) at 213 ("If we had a direct contradiction[,] . . . it would be one thing, but we don't have that. . . . I've already ruled on this, basically, and I was waiting to hear what the testimony would be on this particular point. I've heard it now, there is nothing to be contradicted.").

wanted Gordon to testify that Mark was an alcoholic: "Certainly the plaintiffs would not have been calling Mr. Jones for this purpose, and I guess my question is didn't you have an obligation to do your own investigation, if this was a line of questioning you wanted to develop?" *Id.* at 9; *see also* 16 RP (Oct. 8, 2009) at 215 ("Let's face it. When you made your primary disclosure, you had no idea what Gordon Jones would say because you hadn't done the investigation yet.").

The trial judge was correct that the City had an obligation to investigate and disclose the substance of Gordon Powell's testimony. But she construed the local rules to prohibit admission of Gordon's late-disclosed testimony unless "there's good cause to not have discovered the witness sooner," *id.* at 14, the same construction of the rule that she had applied to the admissibility of Beth Powell's testimony. The only justifications the City offered for its late disclosure were the contradictory arguments that, on the one hand, Gordon had been disclosed all along and, on the other, that it could not have anticipated Gordon's testimony on alcohol because Mark had concealed his drinking problem through evasive interrogatory answers. The judge might reasonably have rejected these explanations, but she did not explicitly (or implicitly) conduct a willfulness inquiry. Rather, she concluded that the City had not "shown good cause for why [Gordon was] so late disclosed."

12-A RP (Sept. 29, 2009) at 25.[15] Under *Burnet*, this is not an adequate finding of willfulness. This court may not supply a willfulness finding that the trial court omitted. *Blair* II, 171 Wn.2d at 350 n.3. We therefore conclude that the judge erred in excluding Powell and Gordon without conducting the full *Burnet* analysis.

### 3. Rose Winquist

The court also omitted the requisite willfulness determination when it excluded testimony by the City's investigator, Rose Winquist. In addition, it failed to consider lesser sanctions before excluding Winquist's testimony. To help explain this omission—which distinguishes her treatment of Winquist from her treatment of Gordon and Powell—we begin with some background on the City's use of private investigators in defending this case.

In August 2007, the City responded to an interrogatory by stating that it had not hired an investigator. In January 2008, the City did retain an investigator, Jess Hill, to conduct "public surveillance" and "some background investigation" of Mark Jones. CP at 8203. But it did not amend its answer to the August 2007 interrogatory. In failing to amend its answer, the City violated CR 26(e)(2), which provides that

---

[15] The record indicates that the judge used the word "her," slightly later in this exchange, to refer to the proffered witness in question. Given the context, which was a ruling that began with the sentence, "I think Gordon Jones is a slightly closer situation," the use of the female pronoun can only be a mistake.

31

[a] party is under a duty seasonably to amend a prior response [to discovery] if he obtains information upon the basis of which . . . (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

The City remained in violation of this rule until June 1, 2009, when it listed Hill in its "Disclosure of Additional Witnesses."

In response to this disclosure, the plaintiff sought to depose Hill, but the City refused, claiming the work product exception. The plaintiff then moved to compel Hill's deposition. The trial court granted the motion in part, directing the City to provide Hill for deposition by August 12, 2009, if it intended to call him as a witness. The court also directed the City to "fully supplement all previous . . . interrogatory answers requiring supplementation." CP at 3601. Instead of permitting Hill's deposition, the City struck him from its witness list on August 11.

The City retained Winquist 10 days later but did not amend its prior interrogatory answers. In its briefs to this court, the City implies that it did not disclose Winquist at first because "she was without personal knowledge of Mark's condition until she observed him at the bar on September 7." Suppl. Br. of Pet'r at 5 n.7. In fact, the City first mentioned in a colloquy on September 11, 2009 that it had pictures of Mark "sitting at a bar." RP (Sept. 11, 2009) at 114. It did not mention Winquist by name until September 18, when it filed a "Disclosure of Additional

32

Rebuttal Witnesses," identifying Winquist as "an investigator [who] may testify regarding investigations she performs or performed, and/or in rebuttal to some of plaintiff's witnesses." CP at 3620-21, 3587. Meg moved to exclude Winquist's testimony on September 21, citing former KCLR 26(b)(4) and arguing that the City's conduct had been "willful" and "unconscionable at every level." CP at 3594.

In court the following day, the City made clear that it wanted to introduce Winquist's surveillance as evidence of Mark's drinking, which the City argued "makes significant difference to his damages, to his cognitive, to his general health, [and to] . . . his quality of life":

> [W]e have photographic evidence . . . that he's drinking the night before this trial starts. It's continued drinking, he's out at bars. His sister's taking him from bar to bar, and the court is letting them hear nothing, instead they're letting them hear simply that he goes along and everything that's wrong in this life is due to this accident. It's a travesty of justice, Your Honor, and at some point . . . it has to be let in, and it's a mistrial and we're adding it to our mistrial basis, continued development of this as we go along.

13 RP (Sept. 22, 2009) at 127, 130. The plaintiff objected that the photos were late-disclosed, speculative "innuendo": "Does he have a beer? Yes, he does. Is he damaging his recovery? There's no evidence of that at all." *Id.* at 131.

The judge did not rule on Winquist's surveillance evidence immediately after this exchange. Instead, at a motion hearing three days later, she directed the parties to establish "ground rules" for examining Meg and Mark and indicated that

Winquist's evidence would be admitted if necessary for impeachment. RP (Sept. 25, 2009) at 68. The judge instructed counsel to "come up with your list of what [questions and evidence are] fair game," so that she could approve it before counsel elicited testimony from Mark and Meg regarding Mark's lifestyle. *Id.* at 70. Meg's counsel objected to the photos' admission "in any way or matter." *Id.* The judge responded, "If you can work out an appropriate area regarding alcohol, that may not be an issue." *Id.* The judge was apparently referring to her earlier ruling that defense counsel could elicit testimony from first-hand witnesses that Mark had engaged in two incidents of heavy drinking after his divorce in mid-2006. Defense counsel responded to this instruction by clarifying the degree to which it could examine witnesses about those two incidents.

When Mark took the stand on September 29, plaintiff's counsel elicited testimony from him that he did chores and carried equipment at his sister's (Tammy) house, went on outings with his young son, went hunting and fishing, and drove himself to Montana. On cross-examination, Mark testified that when he drove, he did not "have any trouble with the rocking [that he exhibited in court]." 12-A RP (Sept. 29, 2009) at 134. He also testified that since his accident, he had "had a lot of girl [friends]." *Id.* at 135. While on the witness stand, Mark rocked back and

forth almost constantly; on cross-examination, he looked down at the floor instead of at defense counsel.

On October 1, Meg took the stand. After her direct examination, the City again offered Winquist's testimony, arguing that Meg's testimony had "open[ed] up in at least 10 areas the alcohol issue." 14 RP (Oct. 1, 2009) at 183. These "areas" all related to Mark's relationship with his ex-wife and his children. The City argued that Meg had attributed Mark's difficult divorce, anger management problems, confusion, and memory loss to the accident and that it should be able to introduce evidence suggesting that these things all stemmed from Mark's heavy drinking. In response, the judge asked defense counsel whether it believed that in every traumatic brain injury case the defense should be allowed to argue addiction as an alternative theory. The judge declined to change her prior ruling excluding most of the City's proffered alcohol-related testimony.

The topic of Winquist did not arise again until October 8, the day the City would recall Mark Jones. Apparently resigned to the fact that Winquist could not testify about Mark's alcohol consumption, the City proposed to admit her as a "rebuttal witness," if it could elicit testimony from Mark that he had not gone "out" the night before trial and had not introduced himself to a woman as "Jonesy from Montana," while "he wasn't rocking, just generally." 16 RP (Oct. 8, 2009) at 9. The

35

judge explained that "[t]hat's not what a rebuttal is," *id.* at 10, and rejected the City's attempt to put on "explosive" testimony by a witness whose existence it had steadfastly refused to disclose:

> [Y]ou're putting out a question there that's going to have a lot of—it's an explosive question, and if you had a witness who would be able to prove it up if he were to deny it, that would be one thing, but you can't have an investigator who observes him the night before trial starts without disclosing them.

*Id.* at 12. The judge also pointed out that neither Mark nor Meg had ever represented to the court that Mark was incapable of socializing in a bar or anywhere else:

> [I]f the position that the plaintiff is taking was that, gosh, Mark is so disabled he can't go out, he can't have a conversation with a woman, he—you know, all of those kinds of things, and you have evidence to contradict that, that would be one thing, but what you're doing is setting him up, hoping that he's not going to remember the incident the way you do, or—I mean, something that's it's not a contradiction, because there's been no position taken that he can't do these things.

*Id.* at 14-15.

Ultimately, there is no question that the City violated the local discovery rules with respect to its investigators. The question presented in this case, however, is whether the judge considered the *Burnet* factors before she ruled. For the reasons given below, we conclude that the judge considered prejudice, but not willfulness or lesser sanctions.

Prejudice. Plaintiff's counsel objected to Winquist's extremely late disclosure on the ground that it left them with no ability to properly prepare for or respond to her testimony. With no reason to anticipate that testimony, for instance, counsel had made no attempt to explain to the jury why Mark had looked down while answering questions on the stand. Had they been given reasonable notice that the City planned to introduce evidence that Mark's appearance in public differed from his appearance at trial, plaintiff's counsel could have addressed this discrepancy.

When the judge ultimately excluded Winquist's testimony and surveillance evidence, she explained that her decision was based on the fact that trial was nearly over, rather than on the fact that the City had violated the discovery rules:

> You know, certainly if this information had come to light before trial started, preferably before the discovery cutoff, we would be in a completely different situation. Surveillance is, of course, completely permissible under those circumstance[s]. But we're not in that situation. We are in the middle of trial. We're, in fact, within days of the end of trial . . . .
>
> . . . .
>
> And it is simply—I can't imagine a better example, well, there have been a number of examples of trial by ambush in this case, but that would be right up there, and I can't allow the investigator to testify, so I'm sorry, but that's my ruling.

19 RP (Oct. 14, 2009) at 17. While perhaps not quite as clear as her analyses of Powell's and Gordon's proffered testimony, the references to Winquist's evidence as "explosive" and an "ambush" meet *Burnet*'s prejudice requirement.

Willfulness. The City never offered a credible justification for disclosing Winquist well after trial began. It made no attempt to explain its misleading interrogatory answers or its last-minute decision to strike its prior investigator from its witness list. The City prevented the deposition of its investigators by asserting, in violation of the discovery rules, that it did not plan to call the investigators as witnesses and by concealing the fact that it had hired Winquist at all.[16] Presumably for this reason, when the trial judge ultimately excluded Winquist's surveillance evidence, she characterized the City's tactics as "trial by ambush." *Id.* Nevertheless, the judge also used this phrase to characterize the City's approach to Powell, as if to mean simply late disclosure that the City had to justify with "good cause." Given

---

[16] With respect to Winquist, the City's conduct amounted to something more than mere omission. When the City first offered Powell's testimony, plaintiff's counsel objected that Powell was no doubt the "product" of the investigator the City had stricken the night before the plaintiff was scheduled to depose him. RP (Sept. 11, 2009) at 105. The City responded by telling the court that Powell did not "come from the investigator that he mentioned." *Id.* This was true: Powell's deposition testimony made clear that she had been contacted by Winquist rather than by the City's previous investigator. Of course, the point of the plaintiff's objection was not that Powell had been contacted by any particular individual, but that the City's refusal to permit the deposition of its investigators was tactical, facilitating the numerous midtrial surprises at issue in this appeal.

her approach to Powell, this court cannot read a proper willfulness finding into the judge's use of the term "ambush." We therefore hold that she did not satisfy *Burnet*'s willfulness prong with respect to Winquist.

Lesser sanctions. As she did with Gordon and Powell, the trial judge considered permitting Winquist to testify as a rebuttal witness. With Gordon and Powell, however, the judge made clear that each would be permitted to testify as a rebuttal witness on matters, other than inadmissible allegations of alcohol-addiction, about which they had first-hand knowledge. In Gordon's case, this meant that the City could elicit testimony from Meg that Mark had once stated he "woke up without pain today." 15 RP (Oct. 7, 2009) at 52. In Powell's case, this meant that the City was permitted to elicit testimony that Mark had performed the physical tasks Powell claimed to have witnessed.

With respect to Winquist, by contrast, the judge did not permit the City to elicit testimony that Mark had been out, socializing, the night before trial. The judge gave two reasons for disallowing this line of questioning. First, she stated that the City had no witness who could "prove it up" if Mark denied socializing with a woman in a bar because the City had not disclosed its investigator. 16 RP (Oct. 8, 2009) at 12. But whether the defense chooses to ask a question of a plaintiff's witness, whose answer it cannot predict, when there is no defense witness available

to prove the matter in rebuttal, is a question of trial tactics—not a *Burnet* factor or lesser sanction. Second, the judge noted that the plaintiff had never represented Mark as incapable of socializing in a bar. Because she found that the plaintiff had not represented Mark this way, she determined that there was nothing for Winquist to rebut.

This reasoning does not meet *Burnet*'s "lesser sanctions" requirement. To say that the plaintiff had not presented Mark as *incapable* of socializing in a bar is not to say that Mark *was* presented to the jury as capable of enjoying a night out. When the City asked permission to question Mark about his activities and demeanor the night before trial, it was attempting to elicit testimony about Mark's capabilities and quality of life. Although the judge had permitted questioning on these subjects when it stemmed from information provided by Powell and Gordon, she disallowed it where it stemmed from Winquist's surveillance. Under *Burnet*, she was required to consider lesser sanctions before doing so.[17]

---

[17] We do not suggest that the trial judge was required to permit questioning at trial regarding the substance of Winquist's offered testimony. Certainly, *Burnet* contains no such requirement. Rather, we note a dispositive difference between the judge's treatment of Gordon and Powell, on the one hand, and her treatment of Winquist on the other. Here, the judge permitted the City to benefit from Gordon's and Powell's offered testimony— thus imposing a lesser sanction than total exclusion—but rejected such accommodation with respect to Winquist.

While we recognize that the trial judge devoted numerous colloquies to the problem of the City's late disclosures, we find that these colloquies omitted several specific inquiries required under *Burnet* and *Mayer*. They omitted the requisite willfulness inquiry with respect to all three of the City's late-disclosed witnesses, and they omitted the lesser sanctions inquiry with respect to the City's investigator, Rose Winquist. These omissions were error.

### C. The trial court's error was harmless

This court has never applied harmless error analysis to a *Burnet* violation, but this case comes to us in a procedural posture that distinguishes it from previous *Burnet* cases addressing witness exclusion.

In *Teter*, 174 Wn.2d at 210, we reviewed a trial court's decision to grant a new trial where one superior court judge had excluded a witness for the plaintiff without considering the *Burnet* factors, and a second superior court judge granted the plaintiff's later motion for a new trial. We upheld the decision of the second judge that the first judge committed a *Burnet* error and that the "error 'materially affect[ed] the substantial rights' of a party." *Teter*, 174 Wn.2d at 220 (citing CR 59(a), (a)(8)). Thus, the second trial judge had found the error prejudicial before granting a new trial, and we affirmed. *Id.* at 216-18.

41

In *Blair* II, 171 Wn.2d at 344, we reversed a summary judgment order of dismissal that resulted directly from the erroneous exclusion of two witnesses for the plaintiff. Since the trial court had dismissed the case on summary judgment, there was no record to review for harmless error, but the error caused the obvious harm of complete dismissal of the case.

Moreover, courts traditionally apply harmless error analysis to witness-exclusion in contexts other than *Burnet* violations. *See, e.g., Thornton*, 19 Wn. App. at 181 (excluded evidence was merely cumulative, so exclusion was harmless error, citing *Latham v. Hennessey*, 13 Wn. App. 518, 535 P.2d 838 (1975), *aff'd*, 87 Wn.2d 550, 554 P.2d 1057 (1976)). Additionally, both parties acknowledged that any witness exclusion error in this case is subject to harmless error review.[18]

The *Burnet* violations at issue in this case were harmless. First, much of the excluded testimony was irrelevant or unfairly prejudicial. As the trial judge stated, most of the testimony that Powell, Gordon, and Winquist would have provided related to Mark's alcohol consumption. The trial judge excluded testimony on that subject—without regard to its source—as irrelevant and unduly prejudicial. The City did not challenge that ruling in its appeal to this court. Exclusion of the purely

---

[18] *See supra* note 5.

alcohol-related testimony offered by Powell, Gordon, or Winquist is thus necessarily harmless.

To be sure, Powell's deposition and declarations by all three excluded witnesses also addressed subjects other than alcohol. As explained below, however, testimony on those other subjects was elicited from other witnesses at trial. Therefore, the non-alcohol-related evidence that the three excluded witnesses would have given was cumulative.

Specifically, Powell's deposition and declaration contained the following proffered non-alcohol-related testimony: that since his fall, Mark had "made many trips out [to Montana]," sometimes by himself, CP at 3779; that while driving by in her car, Powell had observed Mark lifting a canoe or kayak, building shelves with Meg, "cleaning out probably 15 duck," "going into Chubby's Bar & Grill . . . with what I assume is his girlfriend," CP at 3781, going into an establishment called Dapper Dan's, and "doing different things" at his sister Tammy's house "ten days in a row," CP at 3790; that Mark sometimes watched Meg's dogs in Montana while Meg was in Seattle; that since his accident Mark "didn't speak slow," CP at 3796; that Mark had several Montana hunting licenses; that Powell had not observed any "significant difference in [Mark] from before and after the accident," except that

"when he was getting physical therapy, he moved slow and that type of thing," *id.*; and that Mark and Meg are very close and "would die for each other," CP at 3797.

Gordon Jones would have testified that he did not believe Mark was too disabled to attend trial because Mark had spent time in Montana just before trial "hunting, camping, partying, and helping his sister Tammy with things around her house," CP at 4069; that Mark was suing Gordon over a business dispute; that Mark's ex-wife Shawna was embezzling money from the business; that Mark "comes back to MT [(Montana)] several times a year to hunt . . . [and] is usually successful at getting a deer or two every season," CP at 4072; that after receiving treatment from Gordon for over a year, Mark improved to the point at which he was "walking without a cane, . . . bicycling, swimming, and walking with ease," CP at 4073; that Mark had once described himself as "pain-free" early one morning during his treatment; and that Mark had ceased his physical therapy appointments with Gordon after his morphine pump was installed.

Winquist asserted in her declaration that she had observed Mark at a bar called Bert's Tavern, where Mark did not appear to have any disability, but appeared to be "having a great time!" CP at 4309-10. She also asserted that Mark was texting and talking on his cell phone, asked Winquist to play darts with him, referred to himself as "Jonesy from Montana," CP at 4310, stayed at the bar for almost two hours before

44

being picked up by Meg, did not limp or rock back and forth, spoke in a strong and confident voice, chewed tobacco, played video games, chatted with other patrons, and was not in any apparent pain or discomfort. CP at 4310-11.

The vast majority of this testimony was cumulative and largely undisputed. When Mark took the stand on September 29, he clearly stated that he did chores and carried equipment at his sister's (Tammy) house, went on outings with his young son, went hunting and fishing, and drove himself to Montana. On cross-examination, Mark testified that when he drove, he did not "have any trouble with the rocking [that he exhibited in court]." 12-A RP (Sept. 29, 2009) at 134. He also testified that since his accident, he had "had a lot of girl [friends]." *Id.* at 135.

When Mark testified again on October 8, he stated that he began sending text messages after his accident, on the advice of a doctor who told him it "helps with the brain issues and that deal." 16 RP (Oct. 8, 2009) at 49-50. He also briefly explained the origins of his business dispute with his father. He further testified that his normal activities included washing the dishes, playing with his and Meg's two dogs, driving to the store to get chewing tobacco and other items, taking his son to the playground, and driving to the shooting range. Mark explained that he could not remember whether he had ever driven alone to pick up his son but that "most of the

time . . . somebody's with me when I get bear cub." *Id.* at 83. He also stated that his rocking was intermittent, semiunconscious, and a pain-soothing technique.

Meg testified that Mark's appearance at trial reflected the physical and psychological stress of having to sit for extended periods and answer questions and that his symptoms were less pronounced in other settings. Meg told the jury that Mark helped their sister, Tammy, move items into her new condo and that she had not yet hired an attendant to care for Mark. She explained that Mark did chores at her house, like emptying the garbage and vacuuming the floors.

Meg also testified that Mark was "pretty much housebound and in bed" for the first six months after he left the hospital but that he began leaving the house for physical therapy at the Poulsbo Athletic Club after that period. 14 RP (Oct. 1, 2009) at 123. She explained that Mark had hit a "turning point" in 2005 and experienced "a lot more good than bad" that year, even though Mark still had "ups and downs." *Id.* at 125.

When the defense presented its case, Meg elaborated on Mark's progress in 2005, stating the he was "actually able to be on the treadmill a time or two, when he actually ran on the treadmill." 15 RP (Oct. 7, 2009) at 54. She also confirmed that Mark had once stated, at his father's house in Montana, that he had had a pain-free night. Meg explained Mark's legal dispute with Gordon and acknowledged that

Mark had driven to Montana since the accident, both with Meg and by himself. She testified that she had tried to get Mark a "driving evaluation" because she was concerned about his safety, but that he refused. *Id.* at 116.

An erroneous exclusion of evidence is harmless where that evidence is merely cumulative. *Holmes v. Raffo*, 60 Wn.2d 421, 424, 374 P.2d 536 (1962). Here, either Mark or Meg testified that Mark had performed virtually every specific activity cited by the excluded witnesses as evidence that Mark was exaggerating his disabilities. Thus, the jury was already well aware of Mark's ability to hunt, fish, camp, date, drive, do chores, send text messages, and go on outings with his son. For this reason, we hold that the portion of the erroneously excluded evidence that was not irrelevant was instead cumulative and its exclusion was therefore harmless.

II.     The Trial Court Did Not Err in Denying the City's Motion To Vacate the Judgment

A motion to vacate is addressed to the sound discretion of the trial court.[19] Under CR 60(b)(3), a trial court may vacate a judgment where there is "[n]ewly discovered evidence which by due diligence could not have been discovered in time

---

[19] *Griggs*, 92 Wn.2d at 580; *see also Nelson v. Mueller*, 85 Wn.2d 234, 240, 533 P.2d 383 (1975) (trial court has broad discretion when presented with a motion for a new trial based on newly discovered evidence).

to move for a new trial under rule 59(b)."[20] To justify vacating a judgment on the ground of newly discovered evidence, the moving party must establish that the evidence (1) would probably change the result if a new trial were granted, (2) was discovered since trial, (3) could not have been discovered before the trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. *Praytor v. King County*, 69 Wn.2d 637, 639, 419 P.2d 797 (1966) (citing *Nelson v. Placanica*, 33 Wn.2d 523, 526, 206 P.2d 296 (1949)).[21]

The trial judge concluded (without discussion) that the video surveillance evidence was new, material, not merely impeaching, and not merely cumulative. She denied the City's CR 60(b)(3) motion, however, because she also concluded that the City had not exercised reasonable diligence in investigating the extent of Mark's physical disabilities. She made no finding as to the probability that the evidence would have changed the jury's verdict.

There is no question that the posttrial surveillance video constitutes evidence that is new. The City did not possess the video at trial. The video is also material

---

[20] A CR 59(b) motion for new trial must be filed "not later than 10 days after the entry of the judgment, order, or other decision."

[21] *Praytor* interprets CR 59(b), but the only difference between CR 59(b) and CR 60(b)(3) is that the latter applies after the time for filing a motion under CR 59(b) has expired.

in that it is relevant to Mark's physical disabilities—and thus relevant to the issue of damages—and this is the sense in which the trial court used the term "material" in its order. We question whether it was more than merely cumulative, however, since with two minor exceptions noted below, there are no images on the video that contradict any of the trial testimony about Mark's physical capabilities. And the trial judge's decision on due diligence was certainly correct. Thus, the trial judge did not abuse her considerable discretion, *Nelson v. Mueller*, 85 Wn.2d 234, 240, 533 P.2d 383 (1975), in denying the motion to vacate.

> A. The surveillance video did not contradict the plaintiff's "clear and unambiguous" statements about Mark's physical abilities

The City first asserts that it cannot be faulted for a lack of investigative diligence, because it was entitled to rely on the plaintiff's description of Mark's physical condition:

> Under this Court's decisions in *Kurtz v. Fels*, 63 Wn.2d 871, 389 P.2d 659 (1964), and *Praytor v. King County*, 69 Wn.2d 637, 419 P.2d 797 (1966) . . . a party seeking a new trial under CR 60(b)(3) has *no* obligation to do *any* investigation when that party does discovery and the responses are clear and unambiguous. . . . The City therefore had no obligation to conduct any investigation, because it was entitled to rely on the plaintiff's clear and unambiguous responses to the City's damages discovery requests.

Suppl. Br. of Pet'r at 18.

The City is correct that a party may rely on unambiguous interrogatory answers. *Kurtz* and *Praytor* stand for the principle that a party need not "look behind" its opponent's objective factual assertions. *Praytor*, 69 Wn.2d at 640 (citing *Kurtz*, 63 Wn.2d 871). Therefore, if the posttrial surveillance video contradicted any of Mark's or Meg's unambiguous assertions during discovery, it would be error to deny the City's CR 60(b)(3) motion for lack of investigative diligence.

Ultimately, the City does not point to anything in the posttrial surveillance video that contradicts the plaintiff's unambiguous statements about Mark's physical condition. Nor could it. Numerous witnesses for the plaintiff stated, both in discovery and at trial, that Mark engaged in a variety of physical activities at least as rigorous as those depicted in the surveillance video. Meg testified that Mark went hunting, made long car trips, ran errands independently, and did household chores. The City made much of these facts when it presented its theory of the case, telling the jury in its opening statement that Mark was exaggerating his disabilities in order to avoid coming to court:

> Okay, here's what he can do now. He can hunt, he can fish. . . . [H]e drives in Montana a lot more than you've heard, by himself, sometimes with his sister, but what counsel's trying to tell you so he sounds severely damaged, brain damaged, and unable to basically subsist, that he needs a life care companion, he needs a work coach person or partner to go with him to work, to function, he needs a life care companion with him.

Ask yourself this during the trial: Look at the evidence, because the evidence will show you that he's able to operate a car quite often, and a gun . . . I want you to ask yourselves as jurors . . . why he can do those things, why people don't stop him from doing those things, if they are worried that he's so impaired that he needs $25 million and a full-time life care companion and a work care companion, gun and a car.

[L]ike I said, that's a 14-hour drive to Montana that you're going to hear about, writing, yard work, dishes, errands, nutrition, et cetera, and he's sexually active.

He's not here in court, you heard from his lawyers, because of his damage, but you'll see him, and I'd submit to you he can sit in a car and drive 14 hours and do all the things he's been doing, he can do like the rest of us, and come sit in this courtroom . . . at least for more than just when he testifies, but you'll see and you'll be able to assess for yourselves whether he's damaged to the tune of $25 million.

RP (Sept. 14, 2009) at 143-44. In light of these arguments, it is difficult to regard the images on the surveillance video as the smoking gun the City claims they are.

Meg also testified that Mark's appearance at trial reflected the physical and psychological stress of having to sit for extended periods and answer questions and that his symptoms were less pronounced in other settings. Most importantly, the bulk of Meg's testimony focused on the cognitive impairment Mark sustained as a result of his accident. That testimony made quite clear that she sought a personal attendant to care for Mark primarily because he struggled with intellectual tasks such as financial planning, interpersonal communication, travel, and medication-management. Despite the City's frequent assertions to the contrary in its briefs to

51

this court, Meg did not seek "assisted living care [for Mark] 24 hours a day, seven days a week." Suppl. Br. of Pet'r at 6-7.

Before ruling on the motion to vacate, the trial judge watched all of the video surveillance the City had submitted and concluded that, on the whole, it depicted a subject who was "a far cry from the man Mark Jones once was":

> Viewing the video in its entirety, the Court saw a portion from April 2010 where after engaging in some physical activity at the RV [(recreational vehicle)] campsite, [Mark] sat down in a chair next to his female companion and rocked, just as he had at trial, for almost an hour. The video then picks up with Mark Jones and his friend walking on a beach littered with drift wood. Mr. Jones fell and had to be helped up.

CP at 9783. This assessment is telling, particularly in light of the fact that the video represents only a small fraction of the time the City's investigators actually spent observing Mark.

After seeing the posttrial surveillance video, two members of the workers' compensation panel who had evaluated Mark retracted their testimony that he was completely disabled. In addition to declarations by these witnesses, the City submitted a declaration by Dr. Ted Becker, a "well known physical capacities expert." CP at 9782. Dr. Becker stated that "Mr. Jones' physical activities in the video can[not] be reconciled with [his] previous physical capacities evaluation and presentation," and concluded that "Mr. Jones' biomechanical functions are within normal limits for all limbs and the spine." CP at 9461-62.

By contrast, all five of Mark's regular doctors submitted declarations that the video did not change the opinions they had offered at trial. Drs. Friedman, Goodwin, and Brockway, respectively, wrote that they were "surprised" that . . . any physician would say they changed their minds about anything based on this video," CP at 8360; that "[s]urveillance videotape typically does not provide meaningful information . . . with respect to understanding the complexities of an individual's mental state . . . ," CP at 8822; and that "[t]here is [apparently] no scientific basis . . . for reaching any conclusion from the short snippets in this video about Mark's usual psychological or cognitive function . . . ." CP at 8835. These doctors uniformly maintained the views they had expressed at trial: that Mark had made diligent efforts to recover, that he had good and bad days with respect to his physical capabilities, and that his brain injury was the primary reason he could no longer work.

Finally, before ruling on the City's motion to vacate, the trial judge read declarations by several of Mark's friends, all of whom stated that the video primarily represented Mark's good days and that there were other days when pain prevented Mark from doing anything at all. These friends stated that Mark's cognitive impairments made him consistently dependent on others to "organize [his] day," CP at 9710, and "figure out what he was doing or not doing," CP at 9718, and that ". . .

Mark's mental faculties (particularly memory) are greatly diminished as a result of his injuries," CP at 9722.

Ultimately, the images of Mark on the video are ambiguous. They might reveal dishonesty, they might show Mark on rare "good days," and they might depict the effects of improved pain management. They also might indicate the degree to which Mark's self-reporting reflects a sense of frustration and loss. There is, undeniably, some tension between the images on the video and Mark's testimony that he "shuffle[s] around like an 80 years [sic] old and hurt[s] like hell." 12-A RP (Sept. 29, 2009) at 122. But the tension between Mark's good and bad days was present from the beginning of discovery. Neither Meg nor Mark made any secret of the fact that Mark went fishing, camping, and hunting, that he played horseshoes,[22] or that he frequently drove, sometimes from Seattle to Montana. In other words, the image of Mark that emerged in discovery and trial was also far from unambiguous.

This ambiguity distinguishes the present case from *Kurtz* and *Praytor*. In *Kurtz*, the plaintiff testified in deposition and at trial that "never in her life before the accident [occasioning the lawsuit] had she ever fainted" and that since the accident she had fainted "'many times.'" *Kurtz*, 63 Wn.2d at 872. After trial, it was

---

[22] Although the defense never elicited this information in front of the jury, it was aware well before trial that Mark occasionally played horseshoes.

discovered that she "had been subject to fainting spells for . . . many years preceding the accident." *Id.* at 873. This court affirmed the grant of a new trial, finding that the defendant could not be faulted for relying on the plaintiff's unambiguous factual assertions:

> "Counsel had a right to rely on [plaintiff's] testimony when she stated under oath in her deposition that she had never suffered fainting spells previously. She either had or hadn't, and counsel had no reason to question this portion of her testimony in the absence of other evidence."

*Id.* at 875 (quoting trial judge's memorandum decision).

Similarly, in *Praytor*, King County asserted during discovery that a catch basin in the storm sewer system near the plaintiff's house had a cement bottom and so could not possibly be leaking. *Praytor*, 69 Wn.2d at 638-39. Immediately after the plaintiff lost at trial, the county agreed that she could construct a new drain from her property to the catch basin; but the process of constructing this drain revealed that the basin in fact had no concrete lining. *Id.* at 639. This court remanded for retrial, holding that the plaintiff was entitled to rely on sworn testimony by the defendant's agents, "whose official duty it was to know the design and condition of the catch basin," that the basin "possessed a sealed concrete bottom." *Id.* at 640.

Thus, in both *Kurtz* and *Praytor*, objective facts were discovered after trial that were central to one party's case and directly contradicted the other party's unambiguous sworn testimony. In this case, by contrast, as evidenced by the

55

reactions of the various physician-witnesses who watched it, the surveillance video does not directly contradict unambiguous statements presented by the plaintiff's witnesses in discovery or at trial. In fact, in *Kurtz*, which also involved a head injury, this court stated that the defense had "'no reason to question'" the plaintiff's objective statement that she had never suffered fainting spells before her accident. *Kurtz*, 63 Wn.2d at 875. In the present case, both Meg and Mark explicitly acknowledged that Mark could participate in various physical activities despite his injuries. If the evidence of Mark's physical activities in the posttrial video caused the defense to question the accident's debilitating impact, then Mark's and Meg's admissions that Mark participated in numerous similar or identical activities should also have prompted such questions. Neither the plaintiff's discovery responses nor the plaintiff's trial testimony relieved the City of its duty to exercise reasonable diligence in investigating its case.[23]

> B. The trial judge did not abuse her discretion when she concluded that the City failed to exercise reasonable diligence in investigating Mark's physical condition

---

[23] In her ruling denying the City's motion for a new trial, the trial judge noted that the City's only explanation for its failure to retain its own medical experts prior to trial was that it "relied on the records of Mr. Jones' treating physicians." CP at 9782. We agree with the trial judge that this was a "strategic and tactical" decision. *Id.*

56

The City thus had the duty to exercise reasonable diligence in its investigation of Mark's physical condition. The trial judge denied the City's CR 60(b)(3) motion because she found that the City failed to discharge this duty. This is a discretionary determination. *See Winkenwerder v. Knox*, 51 Wn.2d 582, 587, 320 P.2d 304 (1958); *Vance v. Offices of Thurston County Comm'rs*, 117 Wn. App. 660, 671-72, 71 P.3d 680 (2003). In this case, the trial judge denied the motion to vacate primarily because she determined that the City made a strategic decision to invest its resources in "an attempt to discredit Mr. Jones and demonstrate that he was responsible for falling down the pole hole," rather than to question the extent of Mark's injuries. CP at 9780.

While the City maintains that it had no duty to investigate Mark's physical condition, it does not concede that its investigative efforts were inadequate. In its original motion to vacate, the City asserted that it would have conducted a more thorough investigation of Mark's capabilities if it had been permitted to depose him a second time. The trial judge correctly concluded that "this claim is belied by the apparent failure of the City to interview and/or depose any of the people with whom Mr. Jones already testified he was spending time prior to trial." CP at 9781.[24]

---

[24] It is also belied by the City's assertion on the first day of trial that "one of the reasons why [it] repeatedly requested being able to come back to Mark Jones" was that it

It is further belied by the fact that in over two and a half years of discovery, the City never requested that Mark undergo an independent medical examination pursuant to CR 35. Nor did the City interview any of the people with whom Mark went hunting and fishing, even though Mark disclosed their names and phone numbers in a deposition in early 2008 and even though Mark's ex-wife, Ann Jones, stated in her May 2009 deposition that Mark went hunting, fishing, and camping after his accident. The City did retain its own neuropsychologist, but his conclusions matched those of the plaintiff's experts.

The City's investigative priorities were clearly focused on something other than the extent of Mark's disabilities. In an "investigative memo" from February 2008, City investigator Jess Hill explains that he was asked to "conduct background inquiry on Mark Edward Jones . . . to determine any matters that suggest alcohol usage on Mr. Jones' part." CP at 8679. The rest of the memo details Hill's search for various civil and criminal court records. A letter from May 2008 indicates that Hill or other investigators made "several efforts in attempting to contact [Mark's] former wi[ves]." CP at 8689. It also explains that Hill "attempted surveillance on March 26th, April 18th, April 22nd, and April 29th, all with negative results," and

---

wanted to ask Mark about his ex-wife's assertions that he had a drinking problem. RP (Sept. 4, 2009) at 56.

58

that efforts were being made to prepare for "the upcoming surveillance of Mr. Jones in Helena, at his daughter's high school graduation ceremony." *Id.* A subsequent "investigation work" log indicates that an investigator named Tyler Paulsen attempted unsuccessfully to observe Mark getting off an airplane on May 29 and 30 and attending his daughter's graduation on May 30, 2008. CP at 8707. A long letter from Hill on May 22, 2009 details his mostly successful efforts to interview 10 of Mark's former neighbors. Mark's alcohol-consumption was the subject of every single interview.

A letter from Hill dated July 9, 2009 describes the City's requests for "four phases of investigation":

1. Locate former wife Ann Jacobs
2. Conduct neighborhood canvas in Jones' former neighborhood
3. Locate and provide a copy of Mark and Shauna Jones' 1997 Montana dissolution file
4. Interview former wife, Shauna Broderick (Jones)

CP at 8768. A May 13, 2008, invoice lists 30.6 hours of "surveillance time," and an invoice from July 9, 2009, lists none. CP at 8770-71.

These records also show that the City's investigation focused primarily on its "alcohol theory." The trial judge characterized the City's motion to vacate as an attempt to get "a second bite of the apple" after its strategic choices proved unwise.

CP at 9782. The sheer number of alcohol-related motions and colloquies in the record make it difficult to disagree with this assessment.

It is true that defense counsel made six attempts to surveil Mark before trial, but all were unsuccessful. The trial court's ruling on the motion to vacate minimizes these efforts somewhat. Our task, however, is to review the trial judge's evaluation of these complex facts for an abuse of discretion. This deferential standard of review requires us to affirm the ruling denying the motion to vacate.

## CONCLUSION

The Court of Appeals erred when it held that this court's decision in *Blair* made new law that does not apply retroactively. It also erred when it held that the trial court performed the required *Burnet* analysis before excluding testimony from the City's three belatedly disclosed witnesses. The trial court's failure to perform the *Burnet* analysis, however, was harmless because the excluded evidence was irrelevant, unduly prejudicial, or cumulative. We also conclude that the trial judge acted within her discretion in denying the City's motion to vacate based on newly discovered evidence. For these reasons, the judgment of the trial court is affirmed.

Gordon McCloud, J.

WE CONCUR:

Madsen, C.J.

Stephens, J.

Wiggins, J.

Worswick, J.P.T.

No. 87343-7

J.M. JOHNSON, J. (concurring)—I agree with the analysis of Justice González's concurrence. I write separately, however, to express concern that due to the city of Seattle's (City) failure to investigate and follow procedural rules, the jury may have been denied the benefit of relevant evidence and testimony by the challenged orders of the court here. The burden of these errors will fall on the City's taxpayers who must now foot the bill for the $12.75 million judgment in favor of Mark Jones.

The City's counsel apparently failed to conduct a timely diligent investigation that led to violations of procedural rules designed to ensure a fair trial and ultimately led to the exclusion of evidence. The trial court itself cited that "[t]he City devoted little effort to investigating this case until its third set of lawyers was retained in early 2009." Clerk's Papers at 9780 (court's decision and order). The court also noted that "[t]he City did not focus on Mr. Jones' damages at all." *Id.*

Although I agree with Justice González that trial courts must have broad latitude to handle discovery violations after trial commences, the City did a grave disservice to its taxpayers and the fact-finding process through such rule-breaking. It is conceivable that if the excluded testimony and evidence had been timely disclosed and therefore admitted into evidence, the jury would have awarded a lower and more appropriate verdict.

The $12.75 million judgment in favor of Mr. Jones includes $2,433,006 for future medical-related care and $10 million for noneconomic damages. Considering the record on review, which includes nonadmitted evidence due to the late-proffered matters, it appears that this judgment is exaggerated. Nevertheless, I agree with Justice González that the judge in this case appropriately exercised her discretion in managing the trial and the evidence, given the City's lack of diligence. The City's taxpayers are left in an unfortunate position—having no avenue to seek a lower, more fitting judgment. The lesson from this case is the importance of timely discovery and the great costs an unfortunate client may pay as a consequence of a court's enforcement of the rules.

No. 87343-7

GONZÁLEZ, J. (concurring)—We would all do well to follow the example of civility and professionalism set by the late Judge William L. Dwyer. His writings give a sense of what I mean. *See generally* WILLIAM L. DWYER, IPSE DIXIT: HOW THE WORLD LOOKS TO A FEDERAL JUDGE (2007); WILLIAM L. DWYER, IN THE HANDS OF THE PEOPLE: THE TRIAL JURY'S ORIGINS, TRIUMPHS, TROUBLES, AND FUTURE IN AMERICAN DEMOCRACY (2002). In addition, leaders such as Professor Paula Lustbader strive to foster greater civility in the profession. *See generally* ROBERT'S FUND--FOSTERING CIVILITY IN THE LEGAL PROFESSION, http://www.robertsfund.org (last visited Dec. 5, 2013). Unfortunately, practitioners do not always achieve civility in the adversarial system. This case is an example of what happens when the parties are not able to cooperate and follow the rules of witness disclosure. When this happens, the trial judge must step in and restore order and she must have the tools to do so. Here, the majority treads too heavily on the trial court's authority to restore order and conduct a fair trial. At some point in the progress of a lawsuit, the trial court's duty to fairly and expeditiously manage cases

1

must trump *Burnet*'s[1] presumption that a litigant may present new, undisclosed evidence at any time. That point is certainly reached after trial begins—and at the very latest after opening statements. A judge does not abuse his or her discretion by requiring a party who discloses witnesses after the beginning of trial to show good cause why the witnesses should be allowed to testify.

Under *Burnet*, a trial court may exclude witness testimony as a discovery sanction only "upon a showing that (1) the discovery violation was willful or deliberate, (2) the violation substantially prejudiced the opponent's ability to prepare for trial, and (3) the court explicitly considered less severe sanctions." *Teter v. Deck,* 174 Wn.2d 207, 216-17, 274 P.3d 336 (2012) (citing *Burnet*, 131 Wn.2d at 494, 496-97; *Mayer v. Sto Indus., Inc.,* 156 Wn.2d 677, 690, 132 P.3d 115 (2006)). However, *Burnet*, unlike this case, involved discovery violations that occurred well before trial had begun.

Fittingly, Washington appellate courts have required trial courts to consider the *Burnet* factors only when considering sanctions for discovery violations that occurred *before* trial began. In *Burnet*, we reversed a trial court's order limiting discovery and precluding evidence on an issue some 18 months before trial. 131 Wn.2d at 491, 499; *id.* at 502 (Talmadge, J., dissenting); *see also Rivers v. Wash. State Conference of Mason Contractors*, 145 Wn.2d 674, 683, 694, 41 P.3d 1175 (2002) (trial court dismissed complaint about three months before trial); *Peluso v. Barton Auto*

---

[1] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997).

*Dealerships, Inc.*, 138 Wn. App. 65, 68, 69-70, 155 P.3d 978 (2007) (trial court refused to amend case schedule order to allow medical testimony disclosed five days before scheduled trial); *Blair v. Ta-Seattle East No. 176*, 171 Wn.2d 342, 345-47, 254 P.3d 797 (2011) (trial court excluded witnesses that plaintiff added three weeks before trial); *Teter*, 174 Wn.2d at 212 (judge struck medical expert disclosed more than one month before trial). In such cases, where adequate time may remain for both opposing counsel and the court to effectively deal with the new witnesses, the *Burnet* presumption is reasonable. Where circumstances indicate extreme unfairness, the judge must make findings on the record that support an extreme sanction-like exclusion.

In contrast, after trial has begun, under great time pressure to complete the case, litigants should not be entitled to the presumption that new witnesses will be allowed to testify. At that very late stage, fairness to the opposing party and efficiency for the court and jury require a shift in the balance. The trial judge at that point may ask the party offering the previously undisclosed witness what good cause justifies the late disclosure and, if unsatisfied with the answer, she may exclude the testimony without expressly considering each of the *Burnet* factors. In particular, the judge may consider, but should not be required to find, willfulness in balancing the competing equities during trial. In *Lampard v. Roth*, 38 Wn. App. 198, 200, 684 P.2d 1353 (1984), the trial court allowed a party to supplement its answers to interrogatories during trial, adding 11 new witnesses. Toward the end of trial, the court permitted the

same party to call two expert witnesses—one who had been listed as a nonexpert witness in the supplemental answers and another who had not been listed at all. *Id.* at 201. The Court of Appeals concluded that the party willfully failed to comply with the discovery rules and that the trial court abused its discretion by failing to exclude the testimony. *Id.* at 202. The court reasoned that "[i]f witnesses are not disclosed until after the trial begins, the surprised party is put at a serious disadvantage." *Id.* at 201 (citing *Davis v. Marathon Oil Co.,* 528 F.2d 395, 404 (6th Cir. 1975)); *see also M/V La Conte, Inc. v. Leisure,* 55 Wn. App. 396, 402, 777 P.2d 1061 (1989) (affirming trial court's decision to exclude testimony of expert disclosed after the first full day of trial); *Allied Fin. Servs., Inc v. Magnum,* 72 Wn. App. 164, 168-69, 864 P.2d 1, 871 P.2d 1075 (1993) (trial court did not abuse its discretion by prohibiting party from calling witnesses at trial where party willfully failed, up to the time of trial, to name any of its witnesses). *But see Rice v. Janovich,* 109 Wn.2d 48, 56, 742 P.2d 1230 (1987) (applying a pre-*Burnet* standard favoring admission of testimony when reviewing trial court's decision to admit testimony of expert witness identified during trial). In such a situation, the trial judge should be permitted to require a showing of good cause that overcomes the competing equities.

This case stands apart from other instances when a trial court excluded testimony from a late-disclosed witness because of just *how late* the city of Seattle revealed the witnesses. The city offered testimony from three different witnesses between 3 and 20 days after trial began. As Judge Craighead noted, adding witnesses

4

after the start of trial in this case would not only have greatly prejudiced the plaintiff's case but also would have jeopardized court resources by raising the specter of a mistrial. XII-A Verbatim Report of Proceedings (Sept. 29, 2009) (Jury Trial, First Portion of Day) at 24-25 (noting that no prior cases have involved offers of "extremely explosive information" via undisclosed witnesses at such a late stage and that the "prejudicial effect [of such an offer] is dramatic"); *id.* at 27-28 ("[T]his is a witness who is absolutely potentially explosive, and I think that the risks of unfair prejudice, perhaps to the point of a mistrial, are too great . . . ."). Some circumstances—such as the city's disclosure here of multiple "explosive" witnesses during trial—should free the sanction of witness exclusion from *Burnet*'s procedural safeguards and restore it to the reasonable discretion of the trial court.[2]

Declining to extend the *Burnet* factors to situations like that presented here would not prohibit litigants from offering evidence that was first discovered after the start of trial. But a party should not be entitled to the presumption that witnesses disclosed after the start of trial will be allowed to testify, nor should trial courts be expected to consider the *Burnet* factors on the record whenever a litigant upsets a trial in progress by offering late evidence. I concur with the majority in affirming the Court of Appeals and the trial court in this case. However, unlike the majority, I

---

[2] Indeed, in *Burnet* we differentiated two Court of Appeals cases in part because "a significant amount of time yet remained before trial." 131 Wn.2d at 496. Because of the remaining time, the opponent was not greatly prejudiced by "sanctionable conduct on the eve of trial." *Id.* (discussing *Allied Fin. Servs.*, 72 Wn. App. 164 and *Dempere v. Nelson*, 76 Wn. App. 403, 886 P.2d 219 (1994)).

believe the trial court did not err in excluding the late-disclosed witnesses' testimony. Indeed, she would have been justified in excluding them earlier and more forcefully.

González, J.

Owens, J.

Fairhurst, J.

J.M. Johnson